IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ALAN DAVID CHAPPEL,

          Petitioner,               No. CIV S-03-0132 FCD DAD P

     vs.

SILVIA GARCIA, Warden,

          Respondent.         <u>FINDINGS & RECOMMENDATIONS</u>

_____/

          Petitioner is a state prisoner proceeding through counsel with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction entered on July 28, 1999, in the Placer County Superior Court on charges of kidnapping for carjacking, carjacking, kidnapping, second degree robbery and assault with a semi-automatic firearm.  Petitioner seeks relief on the grounds that: (1) his trial counsel rendered ineffective assistance; (2) the trial court violated his rights to compel the attendance of witnesses at trial, to due process, and to a fair trial when it excluded evidence that petitioner's alleged accomplice stole petitioner's gun prior to the commission of the crimes; and (3) the cumulative effect of all errors at his trial requires that his conviction be set aside.  Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's

/////

application for habeas corpus relief be granted on two of petitioner's claims of ineffective assistance of counsel and denied in all other respects.

PROCEDURAL BACKGROUND[1]

By complaint deemed an information on June 18, 1997, the People charged defendant with committing the following crimes:

Count one: Kidnapping for carjacking (Pen. Code, § 209.5, subd. (a));[2]

Count two: Carjacking (§12022.5, subd. (a)(2));

Count three: Kidnapping (207, subd. (a));

Counts four, twelve, thirteen and fourteen: Second degree robbery (§211); and

Counts five through eleven: Assault with a deadly weapon (§245, subd. (b)).

The information also alleged defendant personally used a firearm and was armed with a firearm as to all counts (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a)(1)). As to counts one through five and twelve through fourteen, the information further alleged defendant used a deadly weapon to commit the crimes, within the meaning of section 1203.06, subdivision (a)(1). Each count was alleged to be a serious felony within the meaning of section 1192.7, subdivision (c).

Jury trial commenced August 19, 1997. On October 10, 1997, the trial court declared a mistrial after the jury failed to reach a verdict.

A second jury trial commenced on October 21, 1998. On December 16, 1998, the jury convicted defendant of all counts as charged and determined all special allegations to be true.

On July 28, 1999, the trial court sentenced defendant to an indeterminate term of life imprisonment plus four years on count one, and a total of 26 years 8 months on the remaining counts. It also credited defendant 173 days of conduct and custody credits.

---

[1] The following summary is drawn from the July 10, 2001 opinion by the California Court of Appeal for the Third Appellate District (hereinafter Opinion) at pgs. 2-3, filed on January 24, 2003, as Exhibit 1 to the petition.

[2] All subsequent references to sections are to the Penal Code unless indicated otherwise.

1                   Defendant timely appealed the trial court's judgment by notice
filed August 24, 1999.

2

3  (Opinion at 2-3.)

4              On appeal, petitioner claimed that: (1) the trial court improperly refused to order

5  his accomplice to testify under a grant of immunity and refused to admit the accomplice's earlier

6  statements; (2) his trial counsel rendered ineffective assistance; (3) the trial court improperly

7  admitted expert testimony for the prosecution and excluded defense expert testimony; (4) the

8  prosecutor committed misconduct in voir dire by using rap sheets of potential jurors; (5) the trial

9  court committed jury instruction errors; (6) the jury improperly convicted petitioner of carjacking

10  and kidnapping, both lesser included offenses of kidnapping for carjacking; (7) there was

11  insufficient evidence introduced at trial to support his conviction of robbery against the

12  carjacking victim and the firearm enhancements for the crimes committed against the carjacking

13  victim; and (8) the abstract of judgment misstated the number of credits awarded for time served.

14  (Answer, Ex. A.)  In an unpublished 2-1 split opinion dated July 10, 2001, the California Court

15  of Appeal for the Third Appellate District reversed petitioner's conviction of the lesser included

16  offenses of carjacking and kidnapping and the robbery count against the carjacking victim, and

17  ordered the abstract of judgment corrected to reflect the correct number of credits for time

18  served.  (Opinion at 2.)  In all other respects, the judgment of conviction was affirmed.  (Id.)[3]  On

19  August 21, 2001, petitioner filed a petition for review in the California Supreme Court.  (Answer,

20  Ex. E.)  That petition was summarily denied by order dated October 17, 2001.  (Answer, Ex. F.)

21              On approximately January 10, 2001, petitioner filed a petition for writ of habeas

22  corpus in the Placer County Superior Court, claiming that his trial counsel rendered ineffective

23  assistance.  (Answer, Ex. G.)  That petition was denied in a reasoned decision dated November 1,

24

25        [3]  Davis, J. issued a dissenting opinion in which he concluded that the judgment should be
reversed in its entirety and the defendant (now petitioner) be granted a new trial with competent

26  representation.  (Answer, Ex. A at 1-12.)

2001.  (Answer, Ex. I.)  On January 3, 2002, petitioner filed a petition for writ of habeas corpus

in the California Court of Appeal, claiming that his trial counsel had rendered ineffective

assistance.  (Answer, Ex. H.)  That petition was summarily denied by order dated June 28, 2002.[4]

(Answer, Ex. J.)  On July 29, 2002, petitioner filed a petition for review in the California

Supreme Court, claiming that his trial counsel rendered ineffective assistance.  (Answer, Ex. K.)

That petition was summarily denied by order dated September 25, 2002.  (Answer, Ex. L.)

FACTUAL BACKGROUND[5]

Tamara Scanlon resided with her daughter and son at an apartment
complex on Fair Oaks Boulevard in Carmichael, California.  At
approximately 7:30 a.m., February 29, 1996, Scanlon returned to
her apartment complex's parking lot after driving her daughter to
school.  As she attempted to exit her vehicle, David Maples put a
gun to her face and told her to slide over.[6]  She did so immediately.
Maples entered the driver's side of the car.  He was wearing a
hooded sweatshirt, mirrored sunglasses, and leather gloves.  He
told Scanlon he was going to use her car to rob a bank.  Scanlon
asked him to let her go and he could have her car.  Maples refused.

After driving a short while, Maples pulled into the rear of a
business complex at the corner of San Juan Avenue and Winding
Way.  He ordered Scanlon out of the car so he could put her in the
car's trunk.  Maples then had difficulty starting the car.  He ordered
Scanlon out of the trunk to start the car, then placed her back inside
the trunk.

Scanlon was able to see out of the trunk through an approximately
two-inch wide hole in the back of the trunk where a license plate
light and a reverse-direction light were both missing.  Looking
through the hole, Scanlon was able to determine they were going
back onto San Juan Avenue.  Before they got onto San Juan,
however, Maples stopped the car and told someone he needed to
stop and put gas in the car.  They then headed down San Juan
Avenue towards Madison Avenue.

[4] Davis, J. stated that he would have issued an order to show cause why the petition
should not be granted.  (Id.)

[5] The following summary is drawn from the Opinion at pgs. 3-12.

[6] The parties stipulated that David Maples carjacked and kidnapped Scanlon, and used
her vehicle as the getaway car in the robbery at issue here.

While they were driving, Scanlon stuck two fingers out the hole above the license plate and wiggled them to attract attention. She then looked through the hole, and saw a shiny, newer red sports car following behind her car. A cross hung from the car's rear view mirror. A man with dark hair was driving that car and looking very surprised. Scanlon continued wiggling her fingers out the hole and looking to see the sports car driver's reaction. The driver was now ignoring Scanlon.

Maples pulled into a gas station at the corner of Madison and San Juan Avenues. Scanlon moved away from the hole. She feared Maples would discover the hole because he had to pull down the license plate to access the gas tank. Maples, however, got out of the car, walked back, and told Scanlon if she stuck her fingers out of the hole again, he would shoot her. It was impossible for a person sitting in the driver's seat of Scanlon's car to see the license plate and the hole. Scanlon then found a towel in the trunk and stuffed it through the hole so she could not see out. While at the gas station, Scanlon heard Maples say to someone, "Well, maybe you have to pay for it first."

With Scanlon still in the trunk, Maples drove away from the gas station. At some point, he stopped the car, and another person entered the car's passenger side. Later, the car stopped again. Scanlon heard paper bags rustle and a can's pop top opened. She also smelled cigarette smoke.

At some point, the car stopped again. Scanlon heard both car doors open and close. About five minutes later, she heard people running towards the car. Both car doors opened and slammed shut. The car then accelerated quickly to a high rate of speed. Scanlon was thrown around violently in the trunk. She jammed a finger while trying to grab hold of something and ruptured a nerve in her neck.

A few minutes later, the car stopped. Scanlon heard both occupants immediately get out of the car. As Maples left the car, he said, "Thank you." Scanlon waited for about ten minutes, then began yelling to attract attention. No one responded. She found a pair of pliers in her trunk and used them to open the trunk door. Initially, she was afraid to get out. After waiting a few minutes, however, she got out and went to a nearby business. Inside, she sat down on the floor, told the people there she had been kidnapped and her car had been used to rob a bank, and asked them to call the police. Scanlon had endured being locked in her car trunk for two-and-a-half hours.

On the same morning of February 29, 1996, Sharon Hamilton, Dan Rivinius, and Renee Mahaffey were employed and working as bank tellers for First Interstate Bank in Citrus Heights. At approximately 9:12 a.m., Rivinius was opening her station when two men came into the bank, yelling to everyone to get down or

else be killed.  She got on the ground.  Hamilton did too, setting off a silent alarm as she got down.

The tellers were ordered to get up.  As the tellers got up, one of the men, later identified as Maples, pointed a gun at Hamilton and demanded she put her "top and bottom drawer money" but not any of her "funny money" in a shopping bag he carried.  Hamilton gave him approximately $1,100.  Maples them moved to the next tellers, Rivinius and Mahaffey, and made the same demand on them.  Rivinius threw approximately $13,000 into Maples's bag, and Mahaffey gave him over $4,000.

While this was happening, the other man, referred herein as "robber No. 2" and later identified as defendant, stood guard at the lobby entrance, shouting to the other people on the ground and pointing a large gun at the security guard.  After Maples received the money from Mahaffey, one of the robbers said "nobody move," and the robbers left.

At trial, Hamilton testified robber No. 1 was, in her estimation, approximately six feet tall, while robber No. 2 was significantly shorter, approximately five feet seven inches tall.  She believed robber No. 2 was Spanish or Mexican due to his dark brown eyes.  She testified defendant's eyes and skin coloring were not inconsistent with those of robber No. 2.

Rivinius described robber No. 1 as white and approximately six feet tall.  She described robber No. 2 as being darker in color, and shorter in height than robber No. 1.  She believed defendant to be of the same color as robber No. 2.

Mahaffey described robber No. 1 as a white male, not too short or too tall.  She also described robber No. 2 as being darker in color and shorter in height.  She estimated robber No. 2 to be five feet six or seven inches tall.

Brenda Duclos was the acting branch manager at the bank the day it was robbed.  Robber No. 2 had directed her to get out from behind her desk and lay down on the floor.  She described robber No. 2 as not "extremely tall," "kind of chunky," with brown eyes, dark hair and dark eyebrows.  She believed he was not black, and stood approximately five feet nine or ten inches.

On the morning of the robbery, Richard Morris was using the bank branch's drive-up ATM machine just outside the building.  He noticed two men wearing sweat shirts jogging towards the front of the bank.  One was approximately six feet tall, the other was shorter "by a head' and a little stockier.  Both men had dark hair, dark mustaches, and olive skin tone.

/////

At trial, the prosecution relied in part on the expert testimony of Richard Vorder Bruegge, an examiner of photographic evidence for the Federal Bureau of Investigation's laboratory division. Vorder Bruegge reviewed the bank's surveillance videotapes of the robbery to estimate the robbers' height. Using a technique called reverse projection photogrammetry, he estimated robber No. 2 stood between five feet three inches and five feet seven inches tall. Defendant actually is five feet six inches tall. At the time Vorder Bruegge made his estimates, he did not know either Maples's or defendant's actual height.

Sergeant Robert McDonald of the Placer County Sheriff's Department testified of an interview he had with defendant on April 23, 1996. Maples had already been identified as a suspect in this case, and the investigation turned to Maples's acquaintances, of whom defendant was one. Agent Stephen Broce of the Federal Bureau of Investigation also participated in the interview.

Defendant explained during the interview he was a painter. He and his wife had moved to Folsom from Orange County in January of 1996. He had known Maples for 12 years and considered him a friend. Defendant and Maples saw each other two or three times a week during January.

Defendant informed McDonald he owned a Colt King Cobra .357 Magnum pistol. The gun had a barrel length of six or seven inches, and had a chrome or silver finish. Defendant stated he had misplaced this gun during his move from Southern California to Folsom and had not been able to locate it. Defendant had not reported the gun missing or stolen. A search of defendant's home two days later failed to turn up the gun. Agent Broce found .357 magnum ammunition and paperwork regarding the pistol. Broce testified these descriptions of the .357 Magnum were consistent with the descriptions provided by witnesses and that seen on the surveillance videotape of the weapon used by robber No. 2. Joseph Bertoni, an investigator with the Placer County District Attorney's Office, subsequently obtained a certificate of sale dated March 21, 1987, for a Colt King Cobra, .357-caliber Magnum, six inch barrel revolver. The certificate was issued to defendant, bore his signature, and described him as a Caucasian male with black hair, brown eyes, standing five feet six inches and weighing 170 pounds.

During his April 23 interview with McDonald and Broce, defendant stated it was not unusual for Maples to telephone him, but defendant could not remember receiving a telephone call from Maples on the day of the robbery, February 29. Telephone records, however, disclosed Maples placed four telephone calls to defendant's residence on the day of the robbery, all between 10:05 a.m. and 11:27 a.m. Defendant also telephoned Maples on the same day at 11:27 a.m. During the month of February, 1996, a

total of 30 telephone calls were placed from Maples's residence to defendant's residence. During the same month, 10 calls were made from defendant's residence to Maples's residence.

Also during his April 23 interview, defendant stated he and his wife awoke on the morning of the robbery, February 29, and discussed difficulties they would have in paying upcoming bills. Because defendant did not like to use the last of his money for paying bills, he and his wife decided they would go to Lake Tahoe that day around noon. At trial, defendant admitted at the time of this interview he had worked only one job in two months, and his wife had not worked since January 19. However, on March 1, the day after the robbery, defendant deposited $2,000 in cash into his bank account. He testified $1,000 of that deposit came from payment for a paint job he did in February. He did not explain where the other $1,000 came from. Parenthetically, during the April 23 interview, defendant stated he had "zero balances" in his checking and savings accounts as of that day.

During the search of defendant's home on April 25, 1996, Sergeant McDonald located in the garage a 1986 red Nissan 300 ZX automobile registered to defendant's wife. A cross was hanging from the vehicle's rear view mirror. Under McDonald's direction, photographs of the vehicle were taken from different angles of view.

On April 30, 1996, Scanlon viewed two photo lineups. In the first, she positively identified Maples as the man who held the gun to her face and forced her into her car trunk. The second lineup included defendant. Scanlon made no identification of anyone depicted in those photos.

On May 22, 1996, Sergeant McDonald showed Scanlon three or four photographs of the red sports car found in defendant's garage and licensed to defendant's wife. This was the only car police officers showed Scanlon. She positively identified the car in those photos as the red sports car she saw following her car from her trunk. She based this identification in part on a cross hanging from the rear view mirror of the car in the photograph. She remembered when she was locked in the trunk, she had noticed a cross hanging from the red car's rear view mirror. She recalled grabbing hold of her own cross she was wearing when she saw the cross in the red car and asking God to let her live through this ordeal so she could see her children again. This photo lineup was the first time Scanlon had mentioned anything to officers about noticing a cross in the red car while she was in the trunk of her car. The cross had not been a "major thing" in her mind until she saw the photograph of the car depicting the cross hanging from the rear view mirror.

On July 11, 1996, Scanlon attended a preliminary hearing in this matter on her own volition. While seated in the courtroom,

Scanlon noticed a gentleman walk by and sit down two rows in front of her.  When she got a better look Scanlon identified the gentleman as the man who was driving the red sports car while she was locked in her trunk.  That man was defendant.  Scanlon became upset upon realizing the man she believed helped kidnap her was not in custody.

At trial, Scanlon identified defendant as the man who drove the red sports car behind her car while she was in the trunk.

The defense case attempted to prove a person named David Hernandez, another acquaintance of Maples's, was robber No. 2.  Defendant also testified, stating he did not participate in the February 29, 1996, kidnapping of Scanlon or robbery of the First Interstate Bank.[7]

---

[7]  In the traverse, petitioner points out additional facts from the record, as follows:

(1) Prior to her trial testimony, witness Hamilton had not informed police that Maples' accomplice was "Spanish or Mexican," and even in her trial testimony she was only guessing that this was the case.  (Traverse at 3; RT at 1956, 1941.)

(2) Prior to her trial testimony, witness Mahaffey told the police that Maples' accomplice was a white man.  (Traverse at 3; RT at 2106-07.)  Petitioner is Hispanic.

(3) Witness Duclos, who is Hispanic, told the FBI that Maples' accomplice may have been as tall as six feet and was white or Caucasian, and testified that the accomplice appeared Caucasion but that petitioner appeared to her to be Hispanic with olive skin.  (Traverse at 3-4; RT at 2044, 2059-60, 2067-69.)

(4) Prior to her trial testimony, Witness Rivnius stated to an FBI agent that Maples' accomplice was about six feet tall and white.  (Traverse at 4; RT at 1709.)

(5) Witness Yanes, who observed a passenger in the car Maples had carjacked as it was stopped outside the bank, testified that she was "actually positive" that petitioner was not that passenger.  (Traverse at 4; RT at 2006.)

(6) Eight days after the robbery, after identifying Maples in a photographic display as the carjacker, victim Theresa Scanlon saw a different man in a medical waiting room who she believed may have been the carjacker and called the FBI with this information.  (Traverse at 5; RT at 1764-65; 1853-54;1858-62.)

(7) Prior to viewing the photographs of the red sports car found in petitioner's garage, Ms. Scanlon already believed they might be photographs of the accomplice's car.  (Traverse at 6; RT at 1901-03.)  Although she positively identified the car, in part because of the cross hanging from the rear view mirror, she failed to identify the vehicle from the prominent "Z" in the center of the hood or its heavily tinted windows.  (Traverse at 6; RT at 2603, 2622, 3043-44, 3113.)

(8) The victim was unable to identify petitioner from a photo lineup, even though the photograph of petitioner used in the lineup was a good likeness.  (Reporter's Transcript of Preliminary

ANALYSIS

I. <u>Standards of Review Applicable to Habeas Corpus Claims</u>

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. <u>See</u> <u>Peltier v. Wright</u>, 15 F.3d 860, 861 (9th Cir. 1993); <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing <u>Engle v. Isaac</u>, 456 U.S. 107, 119 (1982)). A federal writ is not available for alleged error in the interpretation or application of state law. <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Park v. California</u>, 202 F.3d 1146, 1149 (9th Cir. 2000); <u>Middleton</u>, 768 F.2d at 1085.

However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." <u>Hines v. Enomoto</u>, 658 F.2d 667, 673 (9th Cir. 1981) (citing <u>Quigg v. Crist</u>, 616 F.2d 1107 (9th Cir. 1980)). <u>See also</u> <u>Lisenba v. California</u>, 314 U.S. 219, 236 (1941); <u>Henry v. Kernan</u>, 197 F.3d 1021, 1031 (9th Cir. 1999). In order to raise such a claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage of justice." <u>Hill v. United States</u>, 368 U.S. 424, 428 (1962). <u>See also</u> <u>Henry</u>, 197 F.3d at 1031; <u>Crisafi v. Oliver</u>, 396 F.2d 293, 294-95 (9th Cir. 1968). Habeas corpus cannot be utilized to try state issues <u>de novo</u>. <u>Milton v. Wainwright</u>, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). <u>See</u> <u>Lindh v.Murphy</u>, 521 U.S. 320, 336 (1997); <u>Clark v. Murphy</u>, 331 F.3d

---

Hearing (RTPH), Vol. 2, at 47-48.

(9) Petitioner's wife testified that $1,000 deposited in petitioner's checking account shortly after the crimes occurred was from ATM withdrawals and winnings from the Chappels' trip to Lake Tahoe. (Traverse at 8; RT at 2761-66; 2937.)

(10) Petitioner points to evidence that, although Maples placed telephone calls to petitioner's residence on the day of the robbery, no conversations related to the crimes took place. (Traverse at 9-10.)

1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting

habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v.

Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

The phrase "clearly established Federal law, as determined by the Supreme Court"

refers to the holdings of Supreme Court decisions at the time of the relevant state-court decision.

Williams, 529 U.S. at 412.  Therefore, a state court's decision is "contrary to" federal law under

section 2254 if "the state court arrives at a conclusion opposite to that reached by [the Supreme]

Court on a question of law or if the state court decides a case differently than [the Supreme]

Court has on a set of materially indistinguishable facts." Id. at 412-13.

A state court decision is an "unreasonable application of" Supreme Court

precedent if it correctly identifies the correct governing legal rule from Supreme Court cases but

applies it unreasonably to the facts of a particular case.  Id. at 407-08.  The state court may also

unreasonably apply Supreme Court authority if it "either unreasonably extends a legal principle

from [Supreme Court] precedent to a new context where it should not apply or unreasonably

refuses to extend that principle to a new context where it should apply." Id. at 407.

The court looks to the last reasoned state court decision as the basis for the state

court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state

court reaches a decision on the merits but provides no reasoning to support its conclusion, a

federal habeas court independently reviews the record to determine whether habeas corpus relief

is available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003);

Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  When it is clear that a state court has not

reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the

AEDPA's deferential standard does not apply and a federal habeas court must review the claim

de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160,

1167 (9th Cir. 2002).

II.  Petitioner's Claims[8]

   A.  Exclusion of Testimony by Maples

         Petitioner raises two challenges to the trial court's decision not to compel Maples

to testify after the prosecution offered him use immunity.[9]  The court will analyze these claims in

turn below.

      1.  Immunity

         Petitioner first claims that the trial court violated his rights to compel the

attendance of witnesses at trial, to due process and to a fair trial when it refused to grant the

prosecutor's motion to compel Maples to testify, in exchange for a grant of immunity, that he had

stolen petitioner's gun prior to the robbery.  The California Court of Appeal fairly explained the

background to this claim as follows:

> At a pretrial hearing, defense investigators Nancy Jackson and
> Gary Holden testified Maples stated to them he stole defendant's
> silver .357-Magnum pistol when defendant first moved to Folsom.
> At the same hearing, Maples took the stand at the request of
> defendant and, when asked whether he stole the gun, exercised his
> Fifth Amendment privilege against self-incrimination and refused
> to answer.

[8]  For reasons of overall clarity, this court will address petitioner's claims out of the order in which they are presented in the petition.

[9]  As indicated above, it was anticipated that Maples would exculpate petitioner by testifying that he had stolen petitioner's gun shortly before the carjacking and robbery.

The prosecution then indicated it would petition the court to compel Maples to testify regarding the gun in exchange for receiving transactional immunity against criminal charges for stealing the gun.[10]  Maples's attorneys questioned whether a grant of immunity by the Superior Court of Placer County would protect Maples from being prosecuted for theft where the alleged crime occurred, Sacramento County.  The trial court made no ruling at that time.

Subsequently, however, the prosecution formally petitioned the court pursuant to section 1324 to grant Maples use immunity regarding the theft of the gun.[11]  At a hearing on the petition, counsel for Maples stated her client rejected the proposed offer because it was for only use immunity, not transactional immunity as the prosecutor previously stated he would seek.

The trial court agreed with Maples's counsel and rejected the petition: "In that it was the limited use immunity that was offered, [Maples] has a right to reject this.  They have rejected it, and so with that then I cannot order that he be compelled to testify because it would then – these matters could potentially violate his right of self-incrimination, right against self-incrimination.  So therefore he will not be ordered to testify."

Defendant's counsel did not object to the trial court's ruling on the prosecution's petition.

(Opinion at 12-14.)

This court also notes that at the hearing on the prosecutor's motion to grant Maples use immunity, Maples' attorney argued that the grant of immunity offered by the prosecutor was not coextensive with Maples' Fifth Amendment privilege because it was limited to the crime of theft of the gun and did not preclude the prosecution of Maples for his offense conduct in federal court.  (RT at 1564-71.)  Specifically, Maples' counsel argued that the grant of use immunity

does not go to any federal offenses and does not go to those specific crimes.  By virtue of the use immunity and the limited

---

[10]  Transactional immunity "protects against later prosecution related to matters about which the witness testified."  (2 Witkin, Cal. Evidence (4th ed. 2000) Witnesses, § 478, p. 784.)

[11]  Use immunity "protects a witness only against the actual use of the compelled testimony and its fruits."  (Ibid.)

1
immunity he has given, he is still subject to prosecution federally,
and he is still subject to prosecution for any extraneous crimes that
2
he may have committed during those specific crimes.

3      (Id. at 1568.)

4             In the instant petition, petitioner argues that the trial court erred in denying the

5      prosecution's motion to compel Maples' testimony.  He contends that Maples had no right to

6      refuse to testify, because the grant of immunity offered by the prosecutor was "coextensive with a

7      witness' Fifth Amendment protections against self-incrimination and is sufficient to overcome a

8      claim of privilege based thereon."  (Memorandum of Points and Authorities in Support of

9      Petition for Writ of Habeas Corpus (P&A) at 98.)  Petitioner also argues that the trial court's

10     erroneous ruling in this regard is "constitutional in magnitude."  (Id. at 100.)  He contends that

11     Maples' anticipated testimony that he stole petitioner's gun prior to the carjacking was "crucial

12     exculpatory information" because it could have rebutted the prosecution argument that petitioner

13     must have been the accomplice because his gun was used during the robbery.  (Pet. at 23; P&A at

14     100.)  Similarly, petitioner argues that Maples' testimony would have lent support to his

15     argument that someone else could have been the accomplice even though petitioner's gun was

16     used during the crimes.  (Id.)  Petitioner notes that the prosecution attempted to discredit the

17     defense argument that petitioner did not have his gun at the time of the robbery because it had

18     been stolen.  (P&A at 100-01.)  Petitioner argues that Maples' testimony would have precluded

19     these arguments on behalf of the prosecution. (Id. at 95-96.)

20            The state appellate court rejected petitioner's argument on the basis that it had

21     been waived by the failure of petitioner's counsel to object to the trial court's denial of the

22     prosecutor's motion to compel Maples to testify.  (Opinion at 14.)  Citing California law, the

23     appellate court explained:

24
[i]f defendant believed, as he asserts before us, the trial court's
action denied him his constitutional rights, he was required to raise
25
those specific objections to the trial court.  The prosecutor's

26     /////

14

1     request for immunity did not present those issues to the court.
    Defendant's failure to object to the court's ruling on constitutional
2     grounds waives his right to raise those grounds on appeal.

3 (Id. at 14-15.)  Respondent argues that this state appellate court ruling constitutes a procedural

4 bar precluding this court from considering the merits of petitioner's claim.  (Answer at 26-27.)

5 Petitioner, on the other hand, contends that the procedural bar applied by the state court is not

6 adequate to preclude federal review.  (P&A at 104-08.)

7       State courts may decline to review a claim based on a procedural default.

8 Wainwright v. Sykes, 433 U.S. 72 (1977).  As a general rule, a federal habeas court "'will not

9 review a question of federal law decided by a state court if the decision of that court rests on a

10 state law ground that is independent of the federal question and adequate to support the

11 judgment.'"  Calderon v. United States District Court (Bean), 96 F.3d 1126, 1129 (9th Cir. 1996)

12 (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)).  The state rule is only "adequate" if

13 it is "firmly established and regularly followed."  Id.  (quoting Ford v. Georgia, 498 U.S. 411,

14 424 (1991)).  See also Bennett v. Mueller, 322 F 3d 573, 583 (9th Cir. 2003) ("[t]o be deemed

15 adequate, the state law ground for decision must be well-established and consistently applied.")

16 The state rule must also be "independent" in that it is not "interwoven with the federal law."

17 Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting Michigan v. Long, 463 U.S.

18 1032, 1040-41 (1983)).  Even if the state rule is independent and adequate, the claim may be

19 heard if the petitioner can show:  (1) cause for the default and actual prejudice as a result of the

20 alleged violation of federal law; or (2) that failure to consider the claim will result in a

21 fundamental miscarriage of justice.  Coleman, 501 U.S. at 749-50.

22       Although the question of procedural default "should ordinarily be considered

23 first," a reviewing court need not do so "invariably," especially when it turns on difficult

24 questions of state law.  Lambrix v. Singletary, 520 U.S. 518, 524-25 (1997).  See also Busby v.

25 Dretke, 359 F.3d 708, 720 (5th Cir. 2004).  In order to determine whether petitioner's due

26 process claim is subject to a state procedural bar, this court would have to decide, among other

1  things, which state procedural rule(s), if any, bar petitioner's claim, when the state procedural

2  rule(s) became firmly entrenched, and whether the rule(s) have been consistently and regularly

3  applied.  In this regard, petitioner argues that: (1) there is no state procedural rule that clearly

4  applies to bar petitioner's claim because no California court has ruled in a published decision that

5  a criminal defendant must object to the denial of a prosecution request for immunity in order to

6  preserve the issue for appeal; (2) California's contemporaneous objection rule is not consistently

7  applied in the situation confronted by the trial court here or, indeed, in any other situation; and

8  (3) the prosecution's request to compel Maples' testimony was in the nature of a motion in

9  limine and California courts do not require a contemporaneous objection where a party makes a

10  motion in limine seeking the admissibility of disputed evidence.  (Traverse at 105-08.)  In this

11  case, the undersigned finds that petitioner's claim can be resolved more easily by addressing it on

12  the merits.  Accordingly, this court will assume that petitioner's claim is not procedurally

13  defaulted.

14          As explained above, the California Court of Appeal did not reach the merits of

15  petitioner's claim in this regard but denied it on procedural grounds.  The California Supreme

16  Court summarily denied the claim on petition for review, thereby adopting the reasoning of the

17  California Court of Appeal.  <u>See Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-04 (1991) (federal court

18  will "look through" an unexplained state court decision to the last reasoned decision as the basis

19  for the state court's judgment).  Accordingly, there is no state court decision on the merits of

20  petitioner's claim.  When it is clear that a state court has not reached the merits of a petitioner's

21  claim, the AEDPA's deferential standard does not apply and a federal habeas court must review

22  the claim de novo.  <u>Menendez v. Terhune</u>, 422 F.3d 1012, 1025 (9th Cir. 2005); <u>Nulph v. Cook</u>,

23  333 F.3d 1052, 1056 (9th Cir. 2003).[12]  Accordingly, this court will review de novo petitioner's

24

---

25          [12]  Under the AEDPA, factual determinations by the state court are presumed correct and
        can be rebutted only by clear and convincing evidence.  <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1168
26      (9th Cir. 2002).

1  claim that the trial court violated his federal constitutional rights when it declined to compel

2  Maples to testify under a grant of use immunity.

3        A criminal defendant's Sixth Amendment right to call and question witnesses is

4  not an absolute right, but rather is limited by the witness's right to invoke the Fifth Amendment

5  protection against self-incrimination.  United States v. Paris, 827 F.2d 395, 399 (9th Cir. 1987).

6  In federal court, where a witness invokes the Fifth Amendment, the prosecution is empowered to

7  grant use immunity and thereby compel the witness to testify.  United States v. Brutzman, 731

8  F.2d 1449, 1451-52 (9th Cir. 1984).

9        In Zicarelli v. New Jersey State Commission of Investigation, 406 U.S. 472, 475

10  (1972), the United States Supreme Court held that a New Jersey statute which conferred use

11  immunity was coextensive with the scope of the Fifth Amendment privilege against self-

12  incrimination and was therefore sufficient to compel testimony over a claim of the privilege.  In

13  so holding, the court rejected the defendant's argument that only transactional immunity afforded

14  protection commensurate with that afforded by the Fifth Amendment privilege.  Id.  In Kastigar

15  v. United States, 406 U.S. 441 (1972), the Supreme Court held that immunity from use and

16  derivative use offered by a federal statute was coextensive with the scope of the Fifth

17  Amendment privilege, and was therefore sufficient to compel testimony.  The holdings in

18  Zicarelli and Kastigar instruct that the Fifth Amendment to the United States Constitution

19  demands no more than a grant of use and derivative use immunity to supplant the privilege

20  against self-incrimination.  However, these holdings are based on the supposition that the

21  immunity being offered is sufficient to protect the criminal defendant from further prosecution

22  based on his testimony.  See Counselman v. Hitchcock, 142 U.S. 547, 585-86 (1892).

23        As described above, the prosecutor in this case offered Maples use immunity.

24  Maples nonetheless refused to testify because he believed the immunity being offered would not

25  effectively protect him from further prosecution.  At the hearing on the prosecutor's motion to

26  compel, the trial court, the prosecutor, and Maples' counsel discussed the ways in which the

1   prosecutor's offer of immunity might not protect Maples from future prosecution particularly in

2   federal court.  (RT at 1563-71.)  Because it was not clear that Maples would be protected against

3   future prosecution, particularly the possibility of federal charges for kidnapping and bank

4   robbery, and because the prosecution was offering a less comprehensive immunity than it had

5   previously indicated would be made available, the trial court declined to compel Maples to

6   testify.  (Id.)  Petitioner contends that the trial court's ruling in this regard constituted prejudicial

7   error.

8        Respondent argues that even assuming arguendo the trial court erred by refusing

9   to compel Maples' testimony that he stole petitioner's gun, the error was harmless under the

10  circumstances of this case.  This court agrees.  On collateral review, an error is not "harmless" if

11  it "had substantial and injurious effect or influence in determining the jury's verdict."  Brecht v.

12  Abrahamson, 507 U.S. 619, 637 (1993).  In determining whether an error is harmless, the

13  question is "what effect the error had or reasonably may be taken to have had upon the jury's

14  decision.'"  Wade v. Calderon, 29 F.3d 1312, 1322 (9th Cir. 1994) (quoting Brecht, 507 U.S. at

15  642-43 (Stevens, J., concurring)), overruled on other grounds by Rohan ex rel. Gates v.

16  Woodford, 334 F.3d 803, 815 (9th Cir. 2003).  An error is not harmless if a reviewing court is "in

17  grave doubt" as to whether the error had "substantial and injurious effect or influence."  O'Neal v.

18  McAninch, 513 U.S. 432, 435 (1995).

19       Petitioner testified that he owned a silver gun "until it was lost or stolen."  (RT at

20  3531.)[13]  This testimony was supported by police sergeant Robert McDonald, who testified that

21  during the investigation of this case petitioner told him he owned a silver Colt King Cobra pistol

22  but that he had misplaced it during the move to Folsom and didn't have it anymore.  (Id. at 2382-

23  83).  FBI agent Stephen Broce testified that petitioner told him he owned a King Cobra revolver

24

---

25       [13]  Unless otherwise indicated, all references to trial testimony in these findings and
    recommendations refers to the testimony at petitioner's second trial which was held after the jury
26  at his first trial failed to reach a verdict resulting in a mistrial being declared.

but that he "could not find it." (Id. at 2573, 2595.)  Susan Grodecki, one of petitioner's

housemates, testified that she and Maples visited petitioner's new home in Folsom and Maples

was unusually anxious to leave after having been left alone in the garage with boxes full of

petitioner's belongings.  (Id. at 2196-89.)  Richard Cummings, a friend of Maples, testified that

during a conversation he was having with Maples after the kidnapping and robbery, Maples took

off his boots and a chrome-plated pistol fell out.  (Id. at 3146.)  Cummings testified that before

this time he had never seen Maples with a pistol during their 20-year friendship.  (Id. at 3145-47.)

When asked to compare the gun he had seen fall out of Maples' boot with a picture of

petitioner's gun, Cummings agreed that the two guns looked similar.  (Id. at 3147-48.)  All of the

testimony related above, which was presented to the jury at petitioner's second trial, indicated

that petitioner was not in possession of his chrome-plated gun because it had been stolen by

Maples or misplaced before the robbery.  Under these circumstances, the absence of testimony by

Maples himself that he took petitioner's gun did not have had a "substantial" effect on the

verdict.  Maples' proposed testimony merely would have reinforced testimony that the jury had

already heard indicating that petitioner's gun had disappeared from his Folsom residence prior to

the robbery.[14]

For all of these reasons, the trial court's error, if any, in denying the prosecutor's

request to force Maples to testify did not render petitioner's trial fundamentally unfair, nor did it

have a substantial and injurious effect on the verdict.  Accordingly, petitioner is not entitled to

relief on this claim.

/////

/////

---

[14]  The undersigned also notes that the fact petitioner's gun was stolen by Maples, even if true, does not mean that petitioner could not have used it during the robbery.  Maples could simply have given the gun back to petitioner prior to or during the robbery.  Indeed, for this reason, evidence that Maples, and not a stranger, stole petitioner's gun could have lent support to, rather than detracted from, the prosecution's theory that petitioner was Maples' accomplice.

2. <u>Hearsay Exception</u>

Petitioner also claims that the trial court violated his constitutional rights to compel the attendance of witnesses at trial, to due process and to a fair trial under the Sixth and Fourteenth Amendments when it refused to admit Maples' statement that he stole petitioner's gun as admissible under an exception to the hearsay rule. This argument was rejected on the merits by the California courts. Accordingly, the court will analyze the claim under the standard of review set forth in the AEDPA.

The California Court of Appeal explained the background to petitioner's claim in this regard as follows:

> Subsequently at trial, defendant argued Maples's statement of stealing defendant's gun was admissible as a declaration against penal interest, an exception to the hearsay rule codified in Evidence Code section 1230. The trial court ultimately disagreed: "Maybe I should clear the air regarding Mr. Maples because he did assert his 5th amendment rights. He is not available to testify. However, any statements he would have made as far as I can see would be hearsay statements, made outside of court, and I am not satisfied that any appropriate exception has been established to allow any of Maples'[s] out of court statements to be presented."

(Opinion at 15.) Petitioner argues that the trial court's decision in this regard violated the rule established in <u>Chambers v. Mississippi</u>, 410 U.S. 284 (1973), <u>Washington v. Texas</u>, 388 U.S. 14 (1967) and <u>Rock v. Arkansas</u>, 483 U.S. 44 (1987), that "when hearsay statements bear indicia of trustworthiness and are critical to the defense, they may not be excluded by a mechanistic or arbitrary application of state hearsay rules." (Pet. at 26.)

In its decision rejecting petitioner's argument the California Court of Appeal noted that, pursuant to California law, a party who maintains that an out-of-court statement is admissible as a declaration against penal interest "must show that the declarant is unavailable, that the declaration was against the declarant's penal interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." (Opinion at 16.) The state appellate court also noted that "the focus, indeed, the heart of this exception" is the

"trustworthinesss of the declaration." (Id.)  The appellate court agreed that Maples was

unavailable as a witness as a result of his invocation of his Fifth Amendment privilege and that

his statement admitting to the theft of petitioner's gun was a statement against his penal interest.

The court concluded, however, that Maples' statement was untrustworthy, explaining that:

> Maples made his statement under circumstances that do not meet
> the threshold requirement of trustworthiness.  Maples confessed to
> stealing the gun while being interviewed by investigators for
> defendant after having already been convicted and incarcerated for
> committing murder in connection with another bank robbery, after
> pleading guilty to several other bank robberies, and after
> confessing to committing this bank robbery.  It was not an abuse of
> discretion for the trial court to conclude Maples's statement, made
> with knowledge of certain long-term, in all likelihood, life-long
> incarceration, did not "so far subject" Maples to the risk of
> additional criminal liability such that a reasonable person in his
> position would not have made the statement unless he believed it
> to be true.  In other words, Maples had little to lose by making a
> statement that could be used to shift blame off of his friend, the
> defendant.
>
> Such circumstances lack sufficient indicia of reliability and
> trustworthiness for us to conclude the trial court abused its
> discretion in refusing to admit the statement into evidence.

(Id. at 17.)  Petitioner argues that the state appellate court's opinion "arbitrarily refused to

consider all of the evidence corroborative of Maples' admission and instead relied exclusively

upon its own speculation as to Maples' motives, a credibility determination properly left for the

jury."  (Pet. at 26.)

        Absent some federal constitutional violation, a violation of state law does not

provide a basis for habeas relief.  Estelle, 502 U.S. at 67-68.   Accordingly, a state court's

evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the

state proceedings so fundamentally unfair as to violate due process.  Drayden v. White, 232 F.3d

704, 710 (9th Cir. 2000), cert. denied, 532 U.S. 984 (2001); Spivey v. Rocha, 194 F.3d 971, 977-

78 (9th Cir. 1999), cert. denied, 531 U.S. 995 (2000); Jammal v. Van de Kamp, 926 F.2d 918,

919 (9th Cir. 1991).  Criminal defendants have a constitutional right, implicit in the Sixth

Amendment, to present a defense; this right is "a fundamental element of due process of law."

1  Washington v. Texas, 388 U.S. 14, 19 (1967).  See also Holmes v. South Carolina, ___ U.S. ___,

2  126 S.Ct. 1727 (2006); Crane v. Kentucky, 476 U.S. 683, 687, 690 (1986); California v.

3  Trombetta, 467 U.S. 479, 485 (1984); Webb v. Texas, 409 U.S. 95, 98 (1972).  However, the

4  constitutional right to present a defense is not absolute.  Alcala v. Woodford, 334 F.3d 862, 877

5  (9th Cir. 2003).  "Even relevant and reliable evidence can be excluded when the state interest is

6  strong."  Perry v. Rushen, 713 F.2d 1447, 1450 (9th Cir. 1983).  Thus,

7      [w]here evidence has been excluded pursuant to a state evidentiary
    law, we use a balancing test:  In weighing the importance of

8      evidence offered by a defendant against the state's interest in
    exclusion, the court should consider the probative value of the

9      evidence on the central issue; its reliability; whether it is capable of
    evaluation by the trier of fact; whether it is the sole evidence on the

10     issue or merely cumulative; and whether it constitutes a major part
    of the attempted defense. A court must also consider the purpose of

11     the [evidentiary] rule; its importance; how well the rule
    implements its purpose; and how well the purpose applies to the

12     case at hand. The court must give due weight to the substantial
    state interest in preserving orderly trials, in judicial efficiency, and

13     in excluding unreliable or prejudicial evidence.

14 Alcala, 334 F.3d at 877 (quoting Miller v. Stagner, 757 F.2d 988, 994 (9th Cir. 1985)).  See also

15 Drayden, 232 F. 3d at 711.  Thus, a state law justification for exclusion of evidence does not

16 abridge a criminal defendant's right to present a defense unless it is "arbitrary or

17 disproportionate" and "infringe[s] upon a weighty interest of the accused."  United States v.

18 Scheffer, 523 U.S. 303, 308 (1998).  See also Crane, 476 U.S. at 689-91 (discussion of the

19 tension between the discretion of state courts to exclude evidence at trial and the federal

20 constitutional right to "present a complete defense"); Greene v. Lambert, 288 F.3d at 1081, 1090

21 (9th Cir. 2002).  Further, a criminal defendant "does not have an unfettered right to offer

22 [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of

23 evidence."  Montana v. Egeloff, 518 U.S. 37, 42 (1996) (quoting Taylor v. Illinois, 484 U.S. 400,

24 410 (1988)).

25        The conclusion of the state appellate court that petitioner's right to due process

26 was not violated by the exclusion of Maples' statement that he stole petitioner's gun is not

1  contrary to or an unreasonable application of the federal due process principles discussed herein.

2  Looking to the factors set forth above, this court is persuaded that the exclusion of this evidence

3  did not render petitioner's trial fundamentally unfair or prevent petitioner from presenting his

4  defense.  Evidence that Maples stole petitioner's gun was already before the jury and, as

5  discussed above, was not particularly probative on the issue of the identity of the accomplice.

6  Further, for the reasons explained by the state appellate court, Maples' admission of theft was of

7  questionable reliability given the circumstances under which it was made.  Cf. Chia v. Cambra,

8  360 F.3d 997, 1003 (9th Cir. 2004) (trial court violated petitioner's right to a fair trial and to

9  present a defense where witness's excluded statements were not only reliable, they were material

10  and would have substantially bolstered the petitioner's claims of innocence).  "A habeas

11  petitioner bears a heavy burden in showing a due process violation based on an evidentiary

12  decision." Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005).  Petitioner has failed to meet

13  that burden here.  Accordingly, he is not entitled to relief on this claim.

14      B.  Ineffective Assistance of Counsel

15          Petitioner claims that his trial counsel rendered ineffective assistance as evidenced

16  by numerous alleged errors of counsel.  After setting forth the applicable legal standards, the

17  court will analyze these claims in turn below.

18      1.  Legal Standards

19          The Sixth Amendment guarantees the effective assistance of counsel.  The United

20  States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

21  Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

22  counsel, a petitioner must first show that, considering all the circumstances, counsel's

23  performance fell below an objective standard of reasonableness.  Id. at 687-88.  After a petitioner

24  identifies the acts or omissions that are alleged not to have been the result of reasonable

25  professional judgment, the court must determine whether, in light of all the circumstances, the

26  identified acts or omissions were outside the wide range of professionally competent assistance.

23

1   Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  In assessing an ineffective assistance of

2 counsel claim "[t]here is a strong presumption that counsel's performance falls within the 'wide

3 range of professional assistance.'"  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting

4 Strickland, 466 U.S. at 689).  There is in addition a strong presumption that counsel "exercised

5 acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d

6 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

7         Second, a petitioner must establish that he was prejudiced by counsel's deficient

8 performance.  Strickland, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable

9 probability that, but for counsel's unprofessional errors, the result of the proceeding would have

10 been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine

11 confidence in the outcome."  Id.  See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224

12 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not determine whether counsel's

13 performance was deficient before examining the prejudice suffered by the defendant as a result of

14 the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of

15 lack of sufficient prejudice . . . that course should be followed."  Pizzuto v. Arave, 280 F.3d 949,

16 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

17         2.  Counsel's Failure to Challenge the Victim's Identification of Petitioner as

18 Suggestive and Unreliable

19         Petitioner claims that his trial counsel rendered ineffective assistance because he

20 failed to challenge the victim's identification of petitioner at the preliminary hearing as unduly

21 suggestive and unreliable.

22         a.  State Court Opinion

23         The California Court of Appeal described the facts surrounding this claim as

24 follows:

25         In April 30, 1996, two months after the crime occurred, Scanlon
        was shown a photo lineup of possible suspects.  In the lineup

26         containing Maples's photo, Scanlon successfully identified Maples.

In the lineup containing defendant's photo, however, Scanlon made no identification of any of the photos.

Defendant's first preliminary hearing occurred on July 11, 1996, more than four months after the crime.  Within approximately one week prior to the hearing, Scanlon telephoned Sergeant McDonald and asked if she could attend defendant's preliminary hearing.  She was aware an arrest had been made in the case, and was insistent upon going because she felt she needed closure.  On the morning of the hearing, Scanlon first went to the sheriff's department and met with McDonald, who told her Detective Michael Bennett would accompany her.  Bennett's sole purpose for going was to see if Scanlon recognized defendant.

Before going to the hearing, Bennett read Scanlon the following admonition: "'As a witness, you will be asked to look at several individuals.  No other witnesses, but an officer will be with you when you look at these individuals.  The fact that these individuals are in a courtroom setting should not influence your opinion, and your opinion should be based solely on your recollection of the events of February 29, 1996.'"

"'You should not conclude or guess that the individuals before you are the person or persons who committed the crime.  You are not obliged to identify anyone.  If [sic] is just as important that innocent persons are freed from suspicion as guilty persons are identified.  Please do not discuss the case with other witnesses or indicate to them in any way that you have identified someone if you do identify someone.'"

Bennett and Scanlon then went over to the courtroom at approximately 9:00 a.m.  They took seats a few rows up from the back and a few seats in from the aisle.  The court was conducting its arraignment calendar.  There were a number of people in the courtroom, including approximately six or seven adult males.  Arraignments ended, and Bennett and Scanlon were the only people left in the audience seats.  Several attorneys and police officers were at the counsel tables on the other side of the bar.

Moments later, defendant walked into the courtroom.  He was wearing a gray sports coat with a dress shirt and tie.  He was likely the only person in the courtroom at that time with a dark moustache.  As defendant walked in, Scanlon turned and "locked onto him."  Defendant walked passed [sic] her and Bennett, and took a seat two rows in front of them.  Scanlon continued staring at defendant for approximately two minutes.  Scanlon stared at defendant for so long, Bennett asked her, "Is that someone that could be him?"  Scanlon replied, "I need to look at his face."  Bennett then escorted Scanlon to the front of the courtroom under the pretense of needing to talk with McDonald, who was at the counsel table.  As Bennett began speaking with McDonald,

Scanlon turned, looked at defendant, and said, "That's him."
Scanlon became upset because she was not aware one of her
kidnappers was out on bail.  She expected him to be in custody and
wearing an orange jumpsuit.  Scanlon and Bennett then left the
courtroom.

At the time Scanlon identified defendant, he was the only person
seated in the audience seats, and no one employed on his behalf
was in the courtroom at the time.  During the preliminary
examination, the prosecution elicited testimony about Scanlon's
identification of defendant that day.  At the conclusion of the
hearing, defendant's attorney, then Thomas Leupp, moved to
suppress Scanlon's in-court identification.  The court denied the
motion.

Leupp informed defendant's next attorney, Dean Starks, his belief
that filing a motion to suppress the allegedly suggestive
identification was advisable.  Starks, however, did not file a motion
to exclude the evidence during either of defendant's two trials.  He
did not file a motion because he believed such a motion would not
be successful.  Even if the motion was successful, Starks believed
he would be able to exclude only the evidence of Scanlon's
identification at the preliminary hearing and would not be able to
preclude Scanlon from identifying defendant in front of the jury.

* * *

"To begin with, '[t]he "single person showup" is not inherently
unfair.'  (People v. Floyd (1970) 1 Cal.3d 694, 714 [disapproved
on another ground in People v. Wheeler (1978) 22 Cal.3d 258, 287,
fn. 36].)  More important yet as it relates to this case:  for a witness
identification procedure to violate the due process clauses, the state
must, at the threshold, improperly suggest something to the witness
– i.e., it must, wittingly or unwittingly, initiate an unduly
suggestive procedure.  Due process does not forbid the state to
provide useful further information in response to a witness's
request, for the state is not suggesting anything.

(Opinion at 20-24.)

The state appellate court concluded that petitioner's due process rights were not

violated by the identification process employed at petitioner's preliminary hearing because the

identification was not the product of state action.  The court reasoned as follows:

Here, the state initiated nothing to suggest in advance defendant's
identification.  It previously attempted to obtain Scanlon's
identification of defendant by showing her a photo lineup that
included defendant's photograph.  This was unsuccessful.
Subsequently, Scanlon, on her own initiative, requested to attend

the preliminary hearing – a hearing she could have attended without the sheriff's permission or prior knowledge.  In response to her request, the sheriff read her an admonition that effectively informed her she was to base any identification on the events of the crime uninfluenced by the environment of the courtroom.

Nothing at the publicly-open preliminary hearing was prearranged, staged, or controlled by the sheriff.  After he noticed Scanlon staring at defendant for so long, the deputy accompanying her asked if defendant could have been the person.  This comment was not unduly suggestive as it was a response to Scanlon's obvious sustained stare at defendant.  Further, his escorting Scanlon to the counsel table was in response to her request for a view of defendant's face.

Finally, we are not concerned defendant was the only person sitting in the audience when Scanlon identified him.  This was merely fortuitous.  The sheriff did not arrange for that to occur.  Moreover, nothing about him sitting alone in the audience suggested he was a suspect.  He dressed and acted as a free civilian.  Scanlon was expecting defendant to have been in custody and, thus, to have not been sitting in the audience.  Defendant's sitting in the audience thus helped remove any taint of suggestiveness even remotely created by the situation.

(Id. at 24-25.)  The state appellate court stated that "had Scanlon been invited by law enforcement and had defendant been in custody and led into the courtroom as such, the matter would be closer."  (Id. at 25.)  The court also observed:

[H]ad law enforcement asked Scanlon to attend and had defendant been in custody, wearing jail-issue clothing, and escorted into the courtroom by law enforcement personnel, Scanlon might have surmised who might be the defendant.  In fact, that is what Scanlon was expecting would happen.  However, defendant came into the courtroom as freely as Scanlon.  He was well dressed in civilian clothes.  Nothing about defendant's appearance indicated he was in fact the defendant.

* * *

Where the state does not initiate an unduly suggestive procedure but merely provides useful further information in response to a witness's request, due process is not violated.  So it was here.

We thus conclude the trial court would not have sustained an objection to the manner by which Scanlon identified defendant at his first preliminary hearing.  Accordingly, our due process analysis ends.  Defendant's failure to prove his objection would

1   have been sustained compels our determination he did not suffer
    ineffective assistance of counsel on this basis.

2

3   (Id. at 26-27.)

4           Justice Davis of the California Court of Appeal for the Third Appellate District

5   issued a lengthy dissenting opinion, in which he concluded that petitioner's conviction should be

6   reversed on appeal because his trial counsel rendered ineffective assistance in failing to challenge

7   the admission of Ms. Scanlon's pretrial identification.  (Dissenting Opinion at 1.)  Contrary to the

8   conclusion reached in the majority opinion, Justice Davis found that the showup "was the

9   product of state action by law enforcement officers."  (Id. at 3.)  Justice Davis reasoned as

10  follows:

11          While it is true that Scanlon initiated a request to attend, from that
            point on the officers assumed control.  This was done by
12          admonishing her at the sheriff's office before the identification,
            assigning Detective Bennett as her companion, driving her to the
13          hearing, twice asking her if she recognized defendant as she and
            Bennett sat behind him, and then taking her to the front of the
14          courtroom for a one-on-one, face-to-face, close-up identification of
            the defendant as he sat waiting for his preliminary hearing to begin.

15
            This procedure was tantamount to Detective Bennett telling
16          Scanlon: "This is the man we have charged with your kidnapping.
            Take a look at him and tell me if you agree with us."  The detective
17          created a setting for the showup that sent an unequivocal message
            to Scanlon that the one and only person she was looking at had
18          been arrested, charged with the crime, and was awaiting his
            preliminary hearing.  It focused upon a single individual in a highly
19          provocative and suggestive way that created a substantial
            likelihood of misidentification.  Her identification should not have
20          been admitted.

21                                    *  *  *

22          The United States Supreme Court held in Stovall v. Denno that a
            suggestive pretrial identification procedure does not violate due
23          process when use of the procedure is imperative.  (footnote
            omitted.)  Here, as was the case in In re Hill, the suggestive
24          procedure chosen for the showup was gratuitous and unnecessary.
            No reason is advanced to justify exhibiting defendant in this
25          fashion, thereby deviating from "the time honored method
            universally recognized by law enforcement persons, which permits
26          a complainant to select, *from among several persons*, one about

                                        28

whom he is certain.  (footnote omitted.)  Trial counsel should have tendered a timely objection.  His failure to do so rendered his representation of defendant deficient.

(Id. at 3-5.)

Justice Davis also concluded that trial counsel's failure to object to the identification procedure resulted in prejudice, reasoning as follows:

> Here we know that, had counsel tendered a proper objection, the jury would not have heard that the victim identified defendant at the single-person showup the day of his preliminary hearing.  It is true that Scanlon made a perfunctory identification of defendant at trial.  But as in Wade and Gilbert, the record does not permit an informed judgment whether the in-court identification at trial had a source independent of the tainted showup.  (footnote omitted.)  This was not an issue at trial, although there is some evidence relevant to a determination.

> Without Scanlon's identifications of defendant, there is no evidence directly connecting him with the kidnapping and robbery.  While there is circumstantial evidence that inferentially connects him with the crimes, it is not so compelling that I can conclude that there is not a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  On the contrary, there certainly is a reasonable probability.

> Even with Scanlon's identification testimony, the first trial ended in a hung jury with only six jurors in favor of conviction.  Scanlon's identification of the red sports car was undermined by her failure to initially call to the attention of law enforcement the cross hanging from the rear view mirror, and her failure to notice that the car had darkly tinted windows and a large "Z" on the front.

> Indeed, there is circumstantial evidence from which one can reasonably infer that defendant was Maples' accomplice.  They were friends, played on a pool team together, and visited and spoke to one another shortly before the day of the crimes.  Defendant's general physical characteristics are similar to the accomplice displayed on the bank's video.  Defendant drove a car identified by Scanlon as the car that followed her when she was in the trunk.  Finally, defendant deposited $2,000 in his checking account soon after the robbery.  Without Scanlon's identification, however, this evidence is not so compelling as to overcome the spirited defense defendant tendered.  That defense offered a plausible theory that another acquaintance of Maples was the accomplice, that Scanlon's identification of the car was mistaken, that defendant was a person

/////

1       of good character, and that the $2,000 came from an innocent
        source.  The judgment should be reversed and the defendant given
2       a new trial with competent representation.

3    (Id. at 10-12.)

4              b.  Legal Standards

5         The Due Process Clause of the United States Constitution prohibits the use of

6    identification procedures which are "unnecessarily suggestive and conducive to irreparable

7    mistaken identification."  Stovall v. Denno, 388 U.S. 293, 302 (1967), overruled on other

8    grounds by Griffith v. Kentucky, 479 U.S. 314, 326 (1987) (discussing retroactivity of rules

9    propounded by Supreme Court).  A suggestive identification violates due process if it was

10   unnecessary or "gratuitous" under the circumstances.  Neil v. Biggers,  409 U.S. 188, 198 (1972).

11   See also United States v. Love, 746 F.2d 477, 478 (9th Cir. 1984) (articulating a two-step process

12   in determining the constitutionality of pretrial identification procedures: first, whether the

13   procedures used were impermissibly suggestive and, if so, whether the identification was

14   nonetheless reliable).  Each case must be considered on its own facts and whether due process

15   has been violated depends on the totality of the surrounding circumstances.  Simmons v. United

16   States, 390 U.S. 377, 383 (1968); Stovall, 388 U.S. at 302.

17        If the flaws in the pretrial identification procedures are not so suggestive as to

18   violate due process, "the reliability of properly admitted eyewitness identification, like the

19   credibility of the other parts of the prosecution's case is a matter for the jury."  Foster v.

20   California, 394 U.S. 440, 443 n.2 (1969).  See also Manson v. Brathwaite 432 U.S. 98, 116

21   (1977) ("[j]uries are not so susceptible that they cannot measure intelligently the weight of

22   identification testimony that has some questionable feature").  On the other hand, if an

23   out-of-court identification is inadmissible due to unconstitutionality, an in-court identification is

24   also inadmissible unless the government establishes that it is reliable by introducing "clear and

25   convincing evidence that the in-court identifications were based upon observations of the suspect

26   other than the lineup identification".  United States v. Wade, 388 U.S. 218, 240 (1967).  See also

1  Tomlin v. Myers, 30 F.3d 1235, 1237-41 (9th Cir. 1994) ("[W]e cannot find, as Strickland

2  requires, 'a reasonable probability' that, had Tomlin's counsel objected to the in-court

3  identification, the government would have been able to show--clearly and convincingly--that

4  Mendez's ability to identify Tomlin was not influenced by the illegal line-up."); United States v.

5  Hamilton, 469 F.2d 880, 883 (9th Cir. 1972) (in-court identification admissible, notwithstanding

6  inherent suggestiveness, where it was obviously reliable).

7          Factors indicating the reliability of an identification include: (1) the opportunity to

8  view the criminal at the time of the crime; (2) the witness's degree of attention (including any

9  police training); (3) the accuracy of the prior description; (4) the witness's level of certainty at the

10  confrontation; and (5) the length of time between the crime and the identification.  Manson, 432

11  U.S. at 114 (citing Biggers, 409 U.S. at 199-200)).  Additional factors to be considered in making

12  this determination are "the prior opportunity to observe the alleged criminal act, the existence of

13  any discrepancy between any pre-lineup description and the defendant's actual description, any

14  identification prior to lineup of another person, the identification by picture of the defendant prior

15  to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between

16  the alleged act and the lineup identification." 388 U.S. at 241.  The "central question," however,

17  is "whether under the 'totality of the circumstances' the identification is reliable even though the

18  confrontation procedure was suggestive." Biggers, 409 U.S. at 199.[15]   In some cases, "the

19

20          [15]   Under California law, an extrajudicial identification violates a defendant's right to due
   process if the identification procedure was unduly suggestive and unnecessary, and the
   identification itself, under the totality of the circumstances, was unreliable.  People v. Carpenter,

21  15 Cal. 4th 312, 366-367 (1997).  The defendant has the burden of showing the identification
   procedure was unfair "as a demonstrable reality, not just speculation." People v. DeSantis, 2 Cal.

22  4th 1198, 1222 (1992).  See also People v. Ochoa, 19 Cal. 4th 353, 412 (1998).  If the challenged
   procedure is not impermissibly suggestive, the reviewing court's inquiry into the due process

23  claim ends.  Ochoa, 19 Cal. 4th at 412; DeSantis, 2 Cal. 4th at 1222 & 1224 n.8.  Generally, a
   pretrial identification procedure is deemed unfair if it suggests the identity of the person

24  suspected by the police before the witness has made an identification.  People v. Brandon, 32
   Cal. App. 4th 1033, 1052 (1995).  The crucial question under California law is whether the

25  defendant was singled out from the others in such a way that his identification was a foregone
   conclusion under the circumstances.  People v. Faulkner, 28 Cal. App. 3d 384, 391 (1972)

26  disapproved on other grounds in People v. Hall, 28 Cal. 3d 143, 156, fn.8 (1980) and People v.

1  procedures leading to an eyewitness identification may be so defective as to make the

2  identification constitutionally inadmissible as a matter of law." Foster, 394 U.S. at 443 n.2.[16]

3          c. Analysis

4          The question before this court is whether petitioner's trial counsel rendered

5  ineffective assistance in failing to seek a court ruling concerning the admissibility of the pretrial

6  identification.  Of course, an attorney's failure to make a meritless objection or motion does not

7  constitute ineffective assistance of counsel.  Jones v. Smith, 231 F.3d 1227, 1239 n.8 (9th Cir.

8  2000) (citing Boag v. Raines, 769 F.2d 1341, 1344 (9th Cir. 1985)).  See also Rupe v. Wood, 93

9  F.3d 1434, 1445 (9th Cir. 1996) ("the failure to take a futile action can never be deficient

10 performance").  "To show prejudice under Strickland resulting from the failure to file a motion, a

11 defendant must show that (1) had his counsel filed the motion, it is reasonable that the trial court

12 would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that

13 there would have been an outcome more favorable to him." Wilson v. Henry, 185 F.3d 986, 990

14 (9th Cir. 1999) (citing Kimmelman, 477 U.S. at 373-74).  See also Van Tran v. Lindsey, 212

15 F.3d 1143, 1156-57 (9th Cir. 2000) (no prejudice suffered as a result of counsel's failure to

16 pursue a motion to suppress the lineup identification), overruled on other grounds by Lockyer v.

17 Andrade, 538 U.S. 63 (2003); Ceja v. Stewart, 97 F.3d 1246, 1253 (9th Cir. 1996) (trial counsel

18 is not ineffective in failing to file a suppression motion "which would have been 'meritless on the

19 facts and the law'"); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994) (failure to file suppression

20

21  Bustamonte, 30 Cal. 3d 88, 102 (1981).

22      [16]  In Foster, pretrial identification procedures were found to be unduly suggestive and,
therefore, violative of due process where: (1) the witness failed to identify defendant the first
23  time he confronted him despite a suggestive lineup where the other two persons in the lineup
were substantially shorter than defendant and defendant was wearing a leather jacket similar to
24  that worn by the bank robber; (2) police then arranged a one-on-one show up, at which the
witness could make only a tentative identification; and (3) the police conducted another lineup at
25  which petitioner was the only person who had also been in the first lineup and where the witness,
finally, "was able to muster a definite identification."  Under these circumstances the Supreme
26  Court concluded that "the pretrial confrontations clearly were so arranged as to make the
resulting identifications virtually inevitable."  394 U.S. at 443.

1   motion not ineffective assistance where counsel investigated the possibility of filing the motion

2   and there was no reasonable possibility that the evidence would have been suppressed); United

3   States v. Molina, 934 F.2d 1440, 1447 (9th Cir. 1991) (counsel did not render ineffective

4   assistance by failing to file a motion to suppress that was "clearly lacking in merit").

5           Here, the state appellate court concluded that the pretrial identification procedure

6   that occurred here was not a product of state action.[17]  That conclusion is an unreasonable

7   determination of the facts of this case.  See 28 U.S.C. § 2254(d) (2) (a writ of habeas corpus shall

8   issue if the state court's adjudication of a claim "resulted in a decision that was based on an

9   unreasonable determination of the facts in light of the evidence presented in the State court

10  proceeding").  As explained by Justice Davis in his dissenting opinion on appeal, the

11  identification of petitioner as Maples' accomplice by Ms. Scanlon was orchestrated by state

12  authorities as soon as Ms. Scanlon requested to attend petitioner's preliminary hearing.

13  Following her request, Ms. Scanlon was asked to report to the sheriff's office prior to the

14  hearing, the sheriff's deputy read her an admonition, she was escorted to the hearing, she was

15  asked twice whether she recognized petitioner, and the deputy sheriff assisted her in getting a

16  closer look at petitioner in the courtroom.  Placer County Sheriff Sergeant McDonald testified

17  that the purpose of bringing Ms. Scanlon to petitioner's court hearing was "[t]o see if she saw the

18  person that was driving the red sports car, that was essentially what she was asked to do."

19  (RTPH, Vol. II at 26.)  Sergeant Bennett testified that he met with Ms. Scanlon prior to the

20  hearing because "we wanted to have her come into court today before court started and see if she

21  could identify someone."  (Id. at 60.)  Sergeant Bennett informed Ms. Scanlon that "she was to

22  sit in court today before these proceedings started, and if she happened to see an individual that

23  looked like Al Chappel, she was to tell me and describe him for me."  (Id. at 61.)  Under these

24

25  [17]  Petitioner argues that the state's involvement is irrelevant to whether the procedure
    was unduly suggestive.  However, in Manson, the United States Supreme Court listed the
26  deterrence of improper identification practice as one of the interests underlying the exclusion of
    evidence arising from unnecessarily suggestive identification procedures.  432 U.S. at 112.

1   circumstances, the fact that Ms. Scanlon initially requested to come to the preliminary hearing, as

2   opposed to being asked by the prosecutor or police to do so, appears to be largely irrelevant.  The

3   identification procedure employed here involved state action to such a significant degree that

4   exclusion of the evidence arising therefrom is warranted as a deterrent.[18]

5           This court also concludes that the identification procedure employed was

6   unnecessarily suggestive.  The state appellate court's conclusion that there was no unfairness,

7   largely because Ms. Scanlon initially chose to attend petitioner's preliminary hearing on her own

8   initiative, is an unreasonable application of the United States Supreme Court holdings in Stovall,

9   Biggers, Manson and Simmons.  Under the totality of the circumstances surrounding the

10  identification, there was no doubt that Ms. Scanlon would identify petitioner as one of her

11  kidnappers.  She knew that she was attending the preliminary examination of the person the

12  police so believed was Maples' accomplice that they had charged him as such.  (See RTPH 60-

13  61, 73-74.)[19]  The state appellate court observed that the reason Ms. Scanlon asked to be present

14  was not to ascertain whether petitioner was truly the accomplice, but to obtain "closure."

15  (Opinion at 20; Dissenting Opinion at 2.)  But it is also established in the record that in a

16  telephone conversation with police sergeant McDonald she expressed a "desire" to attend

17  petitioner's preliminary examination but inquired whether that would be "okay." (RTPH II at 23.)

18  After discussing the matter with the prosecutor, the police apparently told Ms. Scanlon that it

19  would be and set out to make arrangements to assist her in that regard.  (Id. at 23, 26-28.)

20

21      [18] Although the state court's recitation of the facts surrounding the pretrial identification
     procedure is not incorrect, the court's conclusion that these facts did not constitute state action is
22   objectively unreasonable and not supported by the record.  For this reason, whether the state
     court's factual conclusion in this regard is analyzed pursuant to 28 U.S.C. § 2254(d)(1) or (d)(2),
23   petitioner is entitled to relief pursuant to AEDPA with respect to this claim.  See Taylor v.
     Maddox, 366 F.3d 992, 1000 (9th Cir. 2004); Torres v. Prunty, 223 F.3d 1103, 1107 (9th Cir.
24   2000).

25      [19] As Justice Davis noted, "[t]his procedure was tantamount to Detective Bennett telling
     Scanlon: 'This is the man we have charged with your kidnapping. Take a look at him and tell me
26   if you agree with us.'" (Dissenting Opinion at 3-4.)

1   Petitioner fit the rough description of the accomplice given by the bank employees and looked

2   similar to the photograph that Ms. Scanlon had seen in the previous photographic display that did

3   not result in her successfully identifying a suspect.  (RTPH, Vol. II at 48.)  While there is no

4   evidence that the photographic display was inherently suggestive and therefore could have

5   "tainted" Ms. Scanlon's identification at the preliminary hearing or at trial, seeing petitioner in

6   the courtroom may well have triggered her memory of his face from the photographic display and

7   not from her view of him from her car trunk.  See e.g., Simmons, 390 U.S. at 383-84 (observing

8   that if a witness has already seen a suspect's photograph, "the witness thereafter is apt to retain in

9   his memory the image of the photograph rather than of the person actually seen, reducing the

10  trustworthiness of subsequent lineup or courtroom identification").[20]

11          Although at the time Ms. Scanlon came into the courtroom there were other male

12  individuals in attendance for the arraignment calendar, the judge called all of their names as their

13  cases came up, thereby effectively eliminating these persons as the suspect.  (RPTH at 67.)  At

14  the time Ms. Scanlon identified petitioner, he was the only person in the courtroom who was not

15  connected with the counsel table.  (Id. at 70.)  Officer Bagley asked Ms. Scanlon twice whether

16  petitioner could be the accomplice.  Cf. United States v. Wade, 388 U.S. 218, 229 (1967) (noting

17  the inherent danger that any suggestion, even unintentional, by persons who conduct the

18  procedure that they expect the witness to identify the accused can lead the witness to make a

19  mistaken identification, both at the identification procedure and at trial); United States v. Bagley,

20

21          [20]  The Ninth Circuit recently addressed a claim of an unconstitutionally suggestive
    pretrial identification procedure in Williams v. Stewart, 441 F.3d 1030 (9th Cir. 2006).  In that
22  case the witness who had been unable to identify the petitioner in a photographic array
    subsequently identified petitioner as the perpetrator at a deposition taken by petitioner himself
23  while dressed in prison attire.  441 F.3d at 1038.  The Ninth Circuit agreed with the state court's
    recognition that the identification was obtained under extremely suggestive circumstances as well
24  as with the state court's conclusion that due process was not violated since petitioner himself
    procured the identification by compelling the witnesses' attendance at the deposition by way of
25  subpoena. Id.  Here, of course, petitioner Chappel did not compel Ms. Scanlon to be present at
    his preliminary hearing.  The result is an identification obtained under extremely suggestive
26  circumstances that does offend due process.

1  772 F.2d 482, 492 (9th Cir. 1985) ("[n]othing in the record even hints at any verbal

2  encouragement by the officers to identify Bagley as the robber").  In addition, the procedure

3  employed here was not imperative: the authorities had more than sufficient time to conduct a

4  traditional and proper lineup.  See Montgomery, 150 F.3d at 992 (photographic identification

5  procedure was unnecessarily suggestive where the government had "ample time to prepare a

6  non-suggestive photographic array").  Cf. Stovall, 388 U.S. at 301-02 (one person show-up in a

7  hospital room of critically wounded victim did not violate due process where the record revealed

8  that the suggestive confrontation was "imperative").  Given the totality of the surrounding

9  circumstances, the identification procedure employed here created "a very substantial likelihood

10 of ... misidentification." Simmons, 390 U.S. at 384. See also Tomlin, 30 F.3d at 1243 ("Tomlin

11 thus was prejudiced by his lawyer's failure to challenge Mendez's in-court identification . . .

12 [a]nd, there is a serious risk that Tomlin was, in fact, wrongly identified as the assailant.")

13         This court also concludes that Ms. Scanlon's identification of petitioner was not

14 reliable when considered in light of the relevant factors identified by the Supreme Court in

15 Biggers.  The first Biggers factor is the opportunity to view the assailant.  Ms. Scanlon had an

16 extremely limited opportunity to view Maples' accomplice.  She was only able to see the

17 accomplice, who was driving a car following hers, through the small hole in the trunk of her car

18 and only when her fingers were not sticking out of the hole.  The second factor is the witness's

19 degree of attention, including any police training.  At the time Ms. Scanlon observed the person

20 following her car, she had no reason to believe that he was an accomplice to her kidnapping.

21 Accordingly, she had no particular reason to commit his face to memory.  Further, she had no

22 training in observations and was involved in an extremely stressful situation which could have

23 negatively impacted her powers of observation.

24         The third Biggers factor is the witness' level of certainty.  Ms. Scanlon was unable

25 to identify petitioner at the preliminary hearing from a distance, even after staring at him for a

26 two-minute period.  After getting a closer look, Ms. Scanlon told Sergeant Bennett that petitioner

"looked like him, except for now he has shorter hair." (RTPH at 61.) Ms. Scanlon also told

Sergeant Bennett that she recognized petitioner because of "the mustache, the face, the eyes, the

hair was the same color and the stature was the same." (Id. at 68.) However, Ms. Scanlon was

not in a position to see petitioner's "stature" at the time of her kidnapping since she was only

able to see his face behind the wheel from the trunk of her car. (See id. at 71.) Prior to the

preliminary hearing, Ms. Scanlon was unable to identify petitioner even from a photograph that

was a good likeness of petitioner's appearance at the hearing. All of these events cast doubt on

the certainty of Ms. Scanlon's identification. In any event, certainty is not always a valid

indicator of the accuracy of the recollection. See United States v. Singleton, 702 F.2d 1159,

1179 (D.C. Cir. 1983) (Skelly Wright, J. dissenting) ("[I]nnumerable authorities have concluded

that a witness' degree of certainty in making an identification generally does not measure its

reliability.").

        The fourth Biggers factor is the time between the crime and the identification.

Ms. Scanlon did not identify petitioner until approximately five months after the crime occurred.

This was a significant period of time over which to remember a face seen only through the hole

in her trunk during an exceptionally terrifying episode. After five months, the image of Maples'

accomplice may not have remained fresh in Ms. Scanlon's mind. See Biggers, 409 U.S. at 201

(stating that lapse of seven months "would be a seriously negative factor in most cases"). But cf.

Montgomery, 150 F.3d at 993 (implicitly finding that one year between the incident and the

identification did not cut against reliability).

        In addition to the factors described above, there are several other considerations

present in this case that negatively impact upon the reliability of Ms. Scanlon's identification.

First, Ms. Scanlon is white and petitioner is Hispanic. See Arizona v. Youngblood, 488 U.S. 51,

72 n.8 (1988) (noting studies indicating that "[c]ross-racial identifications are much less likely to

be accurate than same race identifications"). Further, as noted, Ms. Scanlon was undoubtedly

under a great deal of stress at the time of the crime. Stress has been recognized to distort

witnesses' perceptions.  See e.g., Thigpen v. Cory, 804 F.2d 893, 897 (6th Cir. 1986) ("This court has previously noted the important effects stress or excitement may have on the reliability of an identification.")  The hole in Ms. Scanlon's trunk from which she was able to view the driver following her car was only two inches in diameter, and with the movement of the car and her attempts to alert the driver behind her of her presence in the trunk, Ms. Scanlon was only able to look through this hole "a couple" or three or four times.  (RT at 1747, 2224.)  Two defense investigators testified that because of the dark tinting on the windows of petitioner's vehicle, they were unable to discern the driver when looking from the hole in Ms. Scanlon's trunk into the windshield of petitioner's car.  (RT at 3023-24, 3266-67.)  This testimony casts doubt on Ms. Scanlon's identification of petitioner's vehicle as the car which the accomplice was driving.[21] Finally, the court notes that petitioner was essentially subjected to a one-on-one showup.  "The practice of showing suspects singly . . . has been widely condemned.  Stovall, 388 U.S. at 302.

        After the preliminary examination, petitioner's then-attorney made an oral motion to exclude Ms. Scanlon's identification as unduly suggestive.  The trial court denied the motion, ruling as follows:

> THE COURT:  My view is, is this would go according to weight.  I've listened to the testimony of Mr. McDonald who has been dealing with this witness and also Bennett who has been dealing with her.  Bennett is his name, isn't it?
>
> THE WITNESS: Yes.
>
> THE COURT: I haven't met this witness, but frankly without meeting her I'm fairly impressed.  I see somebody who is doing somewhat of an analytical job in trying to come with the right thing, and I'm looking at these photos, and I do agree with [petitioner's counsel] that the photo of his client does not do him injustice.  It is like him.  I agree with you on that.

/////

/////

---

[21] Officer Bertoni testified that when he looked through the hole into the driver's seat of *his own car*, the driver of the car was clearly visible.  (Id. at 2232-35.)

On the other hand, the other four photos are – whereas they are not from a – how would you call it.  If you picked them apart, you could not mistake them for the defendant, I would agree with that also.

On the other hand, I could well see from a common sense standpoint a witness being unsure from this group of photos and like I said trying to do the right thing and then wanting to see the person in court, or at least in the flesh, to see what kind of an impression that viewing makes on her.  And, whereas, I would agree with you it is weakened to an extent.  I do not agree that it is so speculative that I would be forced either from a discretionary standpoint or a legal standpoint from considering it at all.

So that's what I'm going to hold, essentially, the old argument or the old statement that it has more weight than admissibility and that's my holding.

(RTPH at 47-48.)

After his preliminary hearing, petitioner obtained a new attorney to represent him at trial.  As explained above, petitioner's former attorney advised trial counsel to file a motion to exclude the pretrial identification.  Trial counsel did not file such a motion because he did not believe a motion to exclude the pretrial identification would be successful and, even if the motion prevailed, he believed he would still be unable to prevent Ms. Scanlon from identifying petitioner at trial.  (Id. at 824-25.)  The authorities cited above establish that trial counsel's belief was incorrect.  Wade, 388 U.S. at 240.

Trial counsel's decision not to challenge Ms. Scanlon's identification of petitioner constituted ineffective assistance of counsel.  The circumstances of this case compel the conclusion that a motion to suppress would have been clearly meritorious and should have been filed.  As explained above, the state appellate court's conclusion that the identification procedure was not coordinated by the state is contrary to the facts of this case.  In fact, the state took control of the entire identification process.  The state court's conclusion that the procedure was not unduly suggestive is an unreasonable application of controlling United States Supreme Court authority.  This is not a situation where the reliability of the identification outweighs the corrupting effect of the suggestive pre-trial identification procedure.  On the contrary, it is

1 difficult to conceive of circumstances in which the risk of a mistaken identification would be

2 more substantial.

3          Finally, for the reasons expressed in the dissenting opinion of Justice Davis on

4 appeal in state court, counsel's failure to file a motion to suppress clearly resulted in prejudice to

5 petitioner.  The case against petitioner was a close one, as evidenced by the outcome of

6 petitioner's first trial, and petitioner presented a spirited and substantial defense to the charges

7 against him.  The prosecutor compounded the prejudice by emphasizing Ms. Scanlon's

8 identification of petitioner in both his opening statement and closing arguments to the jury.  (RT

9 at 1648-49, 4105-07, 4208-09.)

10          Accordingly, for all of these reasons, petitioner is entitled to relief on his claim

11 that his trial counsel rendered ineffective assistance in failing to challenge Ms. Scanlon's pre-trial

12 identification as unduly suggestive and unreliable.

13     3.  Counsel's Failure to Challenge the Victim's Identification of Petitioner on the Basis

14     that it Occurred Outside the Presence of Petitioner's Attorney

15          Petitioner's next claim is that his trial attorney provided ineffective assistance of

16 counsel when he failed to move to suppress Ms. Scanlon's identification of petitioner at the

17 preliminary hearing on the grounds that it occurred outside the presence of petitioner's attorney.

18 This court will recommend that petitioner be granted habeas relief on this claim as well.

19          a.  Legal Standards

20          Once the right to counsel has attached, a defendant has the right to have counsel

21 present for all "critical stages of the prosecution."  United States v. Akins, 276 F.3d 1141, 1146

22 (9th Cir. 2002) (citing Mempa v. Rhay, 389 U.S. 128, 134 (1967)).  In United States v. Wade,

23 388 U.S. 218, 229 (1967) and Gilbert v. California, 388 U.S. 263 (1967), the United States

24 Supreme Court held that a pretrial lineup is a "critical stage" of the prosecution at which a

25 defendant has the right to the presence of counsel as long as the lineup was conducted at or after

26 the initiation of adversary judicial criminal proceedings--whether by way of formal charge,

preliminary hearing, indictment, information, or arraignment.  See also Kirby v. Illinois, 406 U.S.

682, 689 (1972).   In Moore v. Illinois, 434 U.S. 220 (1977), the Supreme Court extended the

holding in Wade/Gilbert to a one-on-one corporeal identification procedure.  The court reasoned

as follows:

> Wade clearly contemplated that counsel would be required in both
> situations: The pretrial confrontation for purpose of identification
> may take the form of a lineup . . . or presentation of the suspect
> alone to the witness . . . It is obvious that risks of suggestion attend
> either form of confrontation.  (citation omitted.)  Indeed, a one-on-
> one confrontation generally is thought to present greater risks of
> mistaken identification than a lineup.  (citation omitted.)  There is
> no reason, then, to hold that a one-on-one identification procedure
> is not subject to the same requirements as a lineup.

Id. at 229.[22]

On the other hand, a post-accusatory photographic lineup is not a "critical stage"

of the proceedings which requires the presence of counsel.  United States v. Ash, 413 U.S. 300

(1973).  This is because the risks inherent in the use of photographic displays are not so harmful

that an extraordinary system of safeguards is required.  Id. at 321.  The Supreme Court has

explained the rationale behind its distinction between a corporeal lineup procedure and a

photographic identification procedure as follows:

> In United States v. Ash, 413 U.S. 300, 93 S.Ct. 2568, 37
> L.Ed.2d 619 (1973), the Court held that the Sixth Amendment does
> not require that defense counsel be present when a witness views
> police or prosecution photographic arrays.  A photographic
> showing, unlike a corporeal identification, is not a "trial-like
> adversary confrontation" between an accused and agents of the
> government; hence, "no possibility arises that the accused might be
> misled by his lack of familiarity with the law or overpowered by
> his professional adversary."  Id., at 317, 93 S.Ct. at 2577.
> Moreover, even without attending the prosecution's photographic
> showing, defense counsel has an equal chance to prepare for trial
> by presenting his own photographic displays to witnesses before
> trial.  But "[d]uplication by defense counsel is a safeguard that

---

[22]   When a criminal defendant has been subjected to a lineup or showup in the absence of
counsel at a crucial stage of the proceedings, an identification at trial will not be permitted unless
the witness's ability to identify the defendant has an origin independent of the uncounseled
identification proceeding.  Wade, 388 U.S. at 239-41.

1
> normally is not available when a formal confrontation occurs." Id.,
> at 318 n. 10, 93 S.Ct., at 2578.

2

3    Moore, 434 U.S. at 227 n.3.  These cases instruct that a corporeal lineup is a "critical stage" of

4    the prosecution at which an accused has a Sixth Amendment right to the presence of counsel,

5    while a photographic lineup is not such a critical stage.

6                    b.  State Court Opinion

7                    The California Court of Appeal rejected petitioner's argument that his trial

8    counsel rendered ineffective assistance when he failed to challenge the pretrial identification of

9    petitioner at his preliminary hearing as a violation of petitioner's right to counsel.  The state

10   appellate court defined the issue before it as follows:

11
> whether Scanlon's identification of defendant prior to his
> preliminary hearing constituted a confrontation by defendant with
12
> the procedural system of law, the public procesutor, or both, such
> that the results of that confrontation likely settled defendant's fate
13
> and reduced his trial to a formality . . . [i]f the identification was
> such a confrontation, defendant's trial attorney could have objected
14
> to the identification due to defendant not being represented by
> counsel at the time.  If the identification was not such a
15
> confrontation, such an objection would have been futile.

16   (Opinion at 28-29.)  Relying primarily on Ash and the Ninth Circuit decision in the case of

17   United States v. Montgomery, 150 F.3d 983 (9th Cir. 1998), the state appellate court concluded

18   that a motion to suppress would have been meritless and, therefore, petitioner's counsel did not

19   render ineffective assistance in failing to file one.  The state court reasoned as follows:

20
> Of course, Moore is distinguishable from the facts of this case.
> Unlike the victim in Moore, Scanlon went to the hearing on her
21
> own volition; she was not asked to step forward by the judge; she
> knew none of the charges or evidence the prosecution may have
22
> obtained against defendant; she did not know defendant's name nor
> did she hear it uttered by anyone in the courtroom; and she
23
> identified him as he sat in the audience as an anonymous, well-
> dressed, out-of-court citizen.

24
> More importantly, applying the principles of law taught by Wade
25
> Ash and Moore here, we conclude defendant was not entitled to
> assistance of counsel when Scanlon identified him.  At the moment
26
> of identification, defendant was free on bail and sitting in the

courtroom's audience waiting for his public preliminary hearing to begin.  Under that circumstance, defendant was not confronted by either the intricate procedural system of law or his expert adversary, i.e., the prosecutor, at the time of the identification.

None of the deficiencies the Wade court sought to address were present here.  To the extent law enforcement played any role in this situation – a citizen insisting on attending a public court proceeding – it admonished her to be scrupulously fair and objective.  Because defendant was not in custody, there was no opportunity for the prosecuting authorities to drape the situation with illegitimate suggestive influences.  Because there was no contact with the procedural system, defendant was not placed in a position of losing a defense or other rights due to not having the guiding hand of counsel.

Further, defendant was able to present his version of the identification without giving up his privilege against compulsory self-incrimination.  His trial counsel effectively and fully reconstructed the event through cross-examination of Scanlon and the deputy sheriff.  Thus, the manner of the identification actually presented defendant's counsel with strong ammunition by which he attacked the accuracy of Scanlon's identification before the jury in cross-examination as well as by presenting evidence by a person Scanlon at one time misidentified as Maples and by a memory and identification expert challenging the accuracy of a witness's memory in Scanlon's circumstances.

U.S. v. Montgomery (9th Cir. 1998) 150 F.3d 983, is based on very similar facts and strongly supports the conclusion defendant was not denied the right to counsel.  There, a witness (who had previously identified the defendant from a photograph in circumstances found to be suggestive) asked to go to court during trial with an agent of the Drug Enforcement Agency (DEA), on the day before the witness was scheduled to testify, because the witness wanted to "have it right in [his] mind" that the defendant was the perpetrator.  (Id. at pp. 991-995.)  The witness entered the courtroom with the DEA agent and looked at the defendant, who was seated at the defense table.  The witness later testified at trial, identifying the defendant at trial and testifying on cross-examination about the earlier courtroom identification.  (Id. at p. 995.)

The Montgomery defendant argued, as pertinent, that the in-court identification violated his Sixth Amendment right to counsel.  However, Montgomery found no violation.  The court said, "'[t]o determine whether a pretrial event implicates the right to counsel, a court must consider whether cross-examination can reveal any improper procedures that occur in counsel's absence.' [Citation.]" (U. S. v. Montgomery, supra, 150 F.3d at p. 995.)  The witness's viewing of defendant seated at counsel table "was not an

adversarial confrontation.  Montgomery was not confronted by a prosecutor with superior knowledge of the law.  Nor was the accused placed in a position where he was threatened with a loss of an available defense because he did not have the guiding hand of counsel.  Unlike a lineup where the accused is subject to emotional tension that might affect his or her memory regarding improper police suggestions or procedures, and thereby diminish his or her credibility as a witness, Montgomery was covertly observed sitting in the courtroom by an identification witness.  Montgomery's counsel was not aware of this event until he elicited this information from [the witness] during cross-examination.  Montgomery was not faced with the choice of giving up his privilege against compulsory self-incrimination in order to present evidence of the unnecessarily suggestive nature of this identification procedure.  Montgomery's counsel effectively reconstructed this event through cross-examination of the identification witness.  Rather than losing an available defense, the possibility of an identification witness's unnecessarily suggestive confrontation with the defendant presented Montgomery's attorney with strong ammunition to attack the accuracy of [the witness's] identification."  (U.S. v. Montgomery, supra, 150 F.3d at p. 995.)  Thus, there was no Sixth Amendment violation.  (Ibid.)

Montgomery's reasoning with respect to the Sixth Amendment applies here.  We conclude an objection to Scanlon's identification of defendant based on the absence of counsel at the time of the identification would not have been meritorious.  As a result, defendant cannot show his counsel's failure to object on this basis was legally deficient.

(Opinion at 35-37.)

In his dissenting opinion, Justice Davis concluded that petitioner's conviction should also be reversed because his trial counsel rendered ineffective assistance in failing to challenge the admissibility of the pretrial identification procedure on the grounds that it violated petitioner's right to have counsel present.  (Dissenting Opinion at 5.)  Justice Davis reasoned as follows:

We are not required to follow decisions of lower federal courts in construing the Sixth Amendment and we should not here.  (citation omitted.)  Montgomery was wrongly decided and fails to adhere to the controlling authority of the United States Supreme Court's decision in Moore.

Without discussing Moore, the Montgomery decision ignores that the Supreme Court has drawn a clear distinction between post-accusatory *corporeal* identifications conducted by agents of the

government and post-accusatory identifications in which the defendant is not physically present.  The Supreme Court has found the former to be a critical stage of the proceedings for Sixth Amendment purposes, but not the latter.

Montgomery incorrectly concludes that the concern that a defendant is overmatched when his counsel is absent was not implicated because the defendant was unaware of the showup and not confronted by the prosecutor.  (citation omitted.)  The holding in Wade, however, also applies to corporeal lineups conducted by government agents (there an FBI agent), not just prosecutors.  (citation omitted.)  Montgomery fails to appreciate that it is the interaction between the government agent, the setting, and the witness that is critical.  It is that dynamic that defense counsel can observe, and often change.  A defendant has no way of protecting himself while standing on the other side of a one-way glass observation window any more than he does when, as in Montgomery and here, he participates in a showup without his knowledge.  Montgomery's conclusion that a defendant is better off being the object of a surreptitious single-person showup than a participant in a corporeal lineup is remarkable.  The court arrives at this conclusion by expressing concern that during a lineup an "accused is subject to emotional tension that might affect his or her memory regarding improper police suggestions or procedures, and thereby diminish his or her credibility as a witness."  (citation omitted.)  This runs against the established preference for corporeal lineups in which a complainant selects from among several persons.  (citations omitted.)  It also fails to recognize that modern lineups, like the surreptitious showup in Montgomery, do not afford a defendant the opportunity to observe and hear the witness or the instructing agent.

(Id. at 8-10.)

c.  Analysis

As noted above, a petition for a writ of habeas corpus in federal court is to be granted if the state court's opinion "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was "based on an unreasonable determination of the facts in light of the evidence presented" in the state courts.  Woodford v. Visciotti, 537  U.S. 19, 21 (2002) (quoting 28 U.S.C. § 2254(d)).  See also Wiggins v. Smith, 539 U.S. 510, 520 (2003).  A state court's decision is contrary to federal law if it fails to apply the correct controlling Supreme Court authority or if it "confronts a set of facts that are materially indistinguishable from a decision of

1   this Court and nevertheless arrives at a result different from our precedent." Lockyer v. Andrade,

2   538 U.S. 63, 73 (2003) (quoting Williams, 529 U.S. at 405-06). See also Bell v. Cone, 535 U.S.

3   685, 694 (2002). Under this standard, "a federal court may grant relief when a state court has

4   misapplied 'governing legal principles' to 'a set of facts different from those of the case in which

5   the principle was announced.'" Wiggins, 539 U.S. at 520 (quoting Andrade, 123 S. Ct. at 1175).

6        This court concludes that the California Court of Appeal's decision with respect

7   to this claim is "contrary to" clearly established federal law because it confronts a set of facts that

8   are materially indistinguishable from those presented in Wade and Moore and nevertheless

9   arrives at a different result. See Early v. Packer, 573 U.S. 3, 8 (2002) (quoting Williams, 529

10  U.S. at 405-406). In Wade and Moore the United States Supreme Court instructed that a

11  criminal defendant has the right to the assistance of counsel at a corporeal identification

12  procedure at which the defendant is confronted by government agents. That was precisely the

13  situation in this case. The decision in Ash, which addressed the right to counsel in the context of

14  a photographic lineup, is not the applicable and controlling authority. Petitioner was not

15  subjected to a photographic lineup at his preliminary hearing.

16       Under the "unreasonable application" clause of section 2254(d)(1), a federal

17  habeas court may grant the writ if the state court "unreasonably extends a legal principle from

18  [Supreme Court] precedent to a new context where it should not apply." Williams, 529 U.S. at

19  413. See also Yee v. Duncan, 441 F.3d 851, 856 (9th Cir. 2006) (citing Williams). The state

20  court's decision with respect to petitioner's claim is also an unreasonable application of Supreme

21  Court precedent because it unreasonably extends the holding in Ash, which was limited to

22  photographic lineup procedures, to the context of a corporeal identification, where it does not

23  apply. For the reasons set forth by the Supreme Court in Moore, a photographic showing, unlike

24  a corporeal identification, is not a "trial-like adversary confrontation." 434 U.S. at 227 n.3.

25       The Ninth Circuit's decision in Montgomery is neither dispositive nor particularly

26  relevant to the analysis of petitioner's claim. While circuit caselaw can be persuasive authority

46

for purposes of determining whether a particular state court decision is an "unreasonable application" of federal law or what law is "clearly established," Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 2000), there is no need for such assistance from the Ninth Circuit in this case. Here, the state appellate court simply misapplied clearly established United States Supreme Court precedent in reaching its decision.

Respondent suggests that the considerations underlying the Wade decision are not present here because petitioner's counsel was able to fully explore the suggestive nature of the pretrial identification at petitioner's preliminary hearing. Respondent notes that defense counsel elicited testimony regarding the details of that identification, arguing that the jurors could determine for themselves whether to credit Ms. Scanlon's identification of petitioner. However, cross-examination is not a sufficient protection against an unduly suggestive identification procedure such as occurred here. As explained by the Supreme Court in Wade, "the accused's inability effectively to reconstruct at trial any unfairness that occurred at the lineup may deprive him of his only opportunity meaningfully to attack the credibility of the witness' courtroom identification." 388 U.S. at 232. Here, although petitioner's counsel attempted to discredit Ms. Scanlon's pretrial identification, he was unable to do so "meaningfully" because he could not reconstruct the setting or the inherent unfairness of the procedure. In Wade the Supreme Court also noted that:

> The trial which might determine the accused's fate may well not be that in the courtroom but that at the pretrial confrontation, with the State aligned against the accused, the witness the sole jury, and the accused unprotected against the overreaching, intentional or unintentional, and with little or no effective appeal from the judgment there rendered by the witness--'that's the man.'

388 U.S. at 235-236. So it was here. Petitioner's fate was imperiled after Ms. Scanlon identified him at his preliminary hearing in a setting that effectively guaranteed petitioner would be identified as Maples's accomplice. In short, the absence of petitioner's counsel at the identification procedure at issue here "derogate[d] from the accused's right to a fair trial." Id. at

226.  If defense counsel had been present, he could have forestalled the identification procedure at petitioner's preliminary hearing, limited the duration of Ms. Scanlon's observation of petitioner or ensured that a proper lineup procedure was conducted rather than the unduly suggestive one-on-one show up that occurred.[23]

In his declaration filed in connection with petitioner's motion for new trial, petitioner's trial counsel stated that:

> At no time did I file or consider filing a motion challenging the admissibility of Ms. Scanlon's identification of Mr. Chappel on the grounds that Mr. Chappel's Sixth Amendment rights were violated by being subjected to an identification procedure without his attorney present.  This was not an issue that I looked into as part of my trial preparation.

(CT at 825.)  A reasonably competent attorney would have considered and researched such a motion under the circumstances present here.[24]  The failure of petitioner's counsel to do so falls well outside the wide range of professionally competent assistance.

Petitioner has also established prejudice, which in this context is a reasonable probability the trial court would have granted a motion to suppress the identification as meritorious and that, had the motion been granted, it is reasonable to believe there would have been an outcome more favorable to petitioner.  As noted, even with the identification in evidence the jury at petitioner's first trial was unable to reach a verdict with only six jurors voting in favor of conviction.  Further, as explained by Justice Davis his dissenting opinion in the state court appeal, under the circumstances of this case there is a reasonable probability that the outcome

/////

---

[23]  Petitioner's counsel, who did not know that an identification was going to be attempted, was present in the courtroom before and after the identification occurred but had stepped out of the courtroom at the time Ms. Scanlon's identification of petitioner was made. (CT at 814.)

[24]  This is especially true given the fact that petitioner's counsel at the time of the preliminary hearing recommended to new counsel that he move to exclude testimony regarding the identification.

would have been more favorable to petitioner absent evidence of Ms. Scanlon's identification of

petitioner.  For all of these reasons, petitioner is entitled to relief on this claim.

        4.  <u>Counsel's Failure to Object to Evidence and Argument Regarding Petitioner's</u>

<u>Poverty as a Motive for the Offenses</u>

        Petitioner's next claim is that his trial counsel rendered ineffective assistance

when he failed to object to evidence offered and argument made by the prosecutor to the effect

that petitioner's poverty was a motive for the offenses.  This argument claim was rejected by the

California Court of Appeal in a reasoned decision on petitioner's direct appeal.  The appellate

court fairly described the factual background to petitioner's claim in this regard as follows:

> The prosecution elicited the following testimony from defendant,
> his wife, and the investigating deputies regarding defendant's
> financial affairs.  Defendant filed for bankruptcy in 1991, and he
> lost his home to foreclosure that same year.  At the time of the
> robbery, both of the cars owned by defendant and his wife were
> registered in his wife's name due to defendant's bad credit.
>
> Defendant, a painter, did not gainfully work during January 1996.
> Defendant's wife, Sharon Chappel, ended her employment on
> January 19, 1996.  During that January, Sharon Chappel deposited
> into their checking account checks in the amount of $1,700 paid to
> her as severance and $1,644 paid to her for the purchase of her car.
> However, by the beginning of February, those monies were gone.
> During this time, defendant's rent was $850, and he had a truck
> payment of $500.
>
> On February 1, 1996, Sharon Chappel deposited into their checking
> account a check in the amount of $1,200 taken from a Schwab
> investment account she owned.  This withdrawal left the balance in
> her investment account at approximately $450.  She then
> transferred $300 from their checking account to their savings
> account for defendant to access on a trip to Southern California
> with Maples to perform a painting job.  On February 8, 1996,
> Sharon Chappel purchased two money orders totaling $400 and
> deposited them into their checking account, even though she had
> no income at this time.
>
> On February 14, 1996, a check drawn on defendant's and his
> wife's checking account bounced.  On February 15, they deposited
> a check in the amount of $188 paid to Sharon Chappel as
> unemployment.  On February 28, 1996, a check in the amount of
> $35 bounced.  As of February 29, the day of the robbery,
> defendant's checking account had a balance of negative $7, and his

savings account had a balance of approximately $6.  That morning, defendant and his wife awoke and allegedly discussed some difficulties they would have paying upcoming bills.

All of this testimony came into evidence without objection from defendant's trial counsel.

(Opinion at 38-39.)

In addition, during his opening statement, the prosecutor stated as follows:

The first and foremost question in the mind of every victim is why. You are going to see why . . . it comes down to money.

You will hear about financial problems that Alan Chappel and his wife were going through.  They moved to Northern California in January of that year of 1996.  Miss Chappel had quit her job in Southern California.  Alan Chappel was out of work.  Miss Chappel was collecting unemployment.  They had a rent check due.

(RT at 1645.)  In his closing argument the prosecutor repeatedly reminded the jury of the

evidence introduced at trial concerning the financial difficulties experienced by petitioner and his

wife.  (See id. at 4103, 4112, 4117, 4123.)  Petitioner argues that he is entitled to habeas relief

because, "at barest minimum, [counsel] would have requested a limiting instruction that the jury

not consider the admitted financial testimony as evidence of motive."  (P&A at 67.)

The state appellate court concluded that petitioner's trial counsel did not render

ineffective assistance in failing to object to evidence of petitioner's poverty.  The appellate court

explained its reasoning as follows:

The evidence demonstrated defendant and his wife were impecunious. i.e., a state of "having no money" (Webster's II New Riverside University Dict. (1984) p. 613), before the robbery but suddenly came into possession of a relatively large amount of cash immediately after the commission of the robbery.

Defendant argues the prosecution failed to prove he was impecunious.  Sharon Chappel testified she had access to over $1,400 in a 401(k) account, approximately $400 remaining in the Schwab investment account, and an additional $5,000 in another Schwab investment account owned jointly by defendant's wife and her sister.  These matters would go to the weight of the evidence introduced by the prosecution, not the admissibility.  The

1

2

3

challenged evidence clearly was relevant to show defendant was
impecunious before the robbery.

Furthermore, even if Sharon Chappel had access to these funds,
there is nothing in the record indicating any portion of these funds
were included in the $2,000 cash deposit made the day after the
robbery, or that she and defendant did in fact access these funds to
alleviate their condition.

4

5

6

7

8

9

10

11

12

13

14

15

16

Defendant argues the $2,000 deposit was not a "sudden
possession" of money in their circumstances, since they made three
deposits in the two months preceding the robbery.  Yet these
deposits were all in the form of checks each accountable to a
nonrecurring event – severance pay, sale of a car, and withdrawal
from a specific investment account.  In contrast, the $2,000 deposit
consisted solely of unaccountable cash, made at a time when
neither defendant nor his wife were gainfully employed.  Under
these circumstances, the cash deposit is a sudden possession.
Defendant directs us to a reported opinion from the federal Ninth
Circuit Court of Appeals, United States v. Mitchell (1999) 172
F.3d 1104.  (The Attorney General does not discuss the case in its
respondent's brief, despite the possibility of a federal habeas
corpus petition in this case.)  That court reversed a robbery
conviction because the district court erroneously admitted evidence
of the defendant's poverty.  However, the court acknowledged
evidence of poverty is relevant and admissible where it
demonstrates "'more than the mere fact that the defendant is poor,'
such as 'an unexplained an [sic] abrupt change in that status for the
better.' [Citation.] An unexplained abrupt change of circumstances
is not merely proof of motive, but also amounts to circumstantial
evidence of the crime."  (Id. at p. 1110.)

17

18

19

Here, the evidence demonstrated defendant and his wife were
unemployed and impecunious at the time of the robbery, but
enjoyed an unexplained and abrupt change in their circumstance
with the deposit of $2,000 cash.  This holding is consistent with the
exception in federal law acknowledged by the Ninth Circuit in
Mitchell.

20

21

22

Since the evidence was admissible, an objection would have been
futile.  Defendant thus did not suffer ineffective assistance of
counsel due to his trial counsel's failure to object to the
prosecution's evidence of defendant's poverty.

23

(Opinion at 40-42.)

24

The United States Supreme Court has not addressed whether a criminal defense

25

attorney renders ineffective assistance if he fails to object to evidence of defendant's poverty

26

which is admitted to demonstrate a motive for a charged robbery.  However, the Ninth Circuit

1   Court of Appeals has ruled that "evidence of poverty is not admissible to show motive, because it

2   is of slight probative value and would be unfairly prejudicial to poor people charged with

3   crimes." United States v. Mitchell, 172 F.3d 1104, 1108 (9th Cir. 1999).  Evidence of a

4   defendant's poor financial condition is admissible only if there is "more than the mere fact that

5   the defendant is poor."  United States v. Jackson, 882 F.2d 1444, 1449 (9th Cir. 1989).

6   Specifically, there must be evidence of "an unexplained and abrupt change in that status for the

7   better."  Id. at 1450.  To determine whether evidence of a defendant's poverty is relevant, and

8   that its probative value is not outweighed by the risk of prejudice, it is necessary to consider the

9   facts of each particular case.  Mitchell, 172 F.3d at 1108.  "No general proposition can properly

10   resolve all cases, because the multiplicity of circumstances in human conduct is too great."  Id.

11          The evidence introduced at petitioner's trial relevant to his financial status and

12   history has been set forth above.  In this case, that evidence was relevant to show more than the

13   mere fact that petitioner was poor.  It was also relevant to demonstrate that the $2,000 deposited

14   immediately after the robbery constituted an "abrupt change" in petitioner's monetary

15   circumstances that could have come about because he had received some of the proceeds of the

16   bank robbery.  Petitioner argues that the deposit of the $2,000 was not an "abrupt change in

17   circumstances" because petitioner and his wife had access to funds from other sources, including

18   the parents of petitioner's wife.  However, as explained by the state appellate court, there was no

19   evidence suggesting that the $2,000 deposit came from those other sources of funds.  Rather, as

20   found by the California Court of Appeal, the evidence showed that the $2,000 was an all-cash

21   deposit from an unknown source, deposited at a time when petitioner and his wife had spent all

22   of the money deposited into their account in earlier months.  Petitioner has not refuted the state

23   court's factual finding in this regard with clear and convincing evidence and it is therefore

24   presumed to be correct.  28 U.S.C. § 2254(e)(1).  Therefore, while petitioner may have been able

25   to access other funds to make a $2,000 deposit into his bank account on the day after the robbery,

26   there is no evidence that he did so.

1    Evidence of petitioner's sudden change in circumstances was offered as

2    circumstantial evidence of guilt.  The introduction of that evidence did not improperly suggest

3    mere poverty as the motive for a crime.  A review of the record reflects that the evidence was

4    admitted in an effort to demonstrate that the $2,000 deposit on the day after the bank robbery was

5    not deposited in the usual course of business but was an extraordinary event.  Petitioner's

6    counter-explanation that he did not need to commit a bank robbery because he could have gotten

7    money from other sources if he needed it, or that the $2,000 deposit reflected earnings from his

8    gambling trip to Lake Tahoe and a previous painting job, affected the weight of the evidence

9    pertaining to petitioner's financial condition and not its admissibility.  Under the circumstances

10   of this case, trial counsel's failure to object to this admissible evidence or to request a limiting

11   instruction was not improper and does not constitute ineffective assistance.

12   Petitioner also argues that, even assuming the prosecution's introduction of

13   financial evidence is justifiable on the theory that it showed prior poverty followed by sudden

14   unexplained wealth, counsel should have objected to evidence of petitioner's financial condition,

15   and particularly evidence of "the five-year-old bankruptcy and foreclosure, and his bad credit

16   rating," as unduly prejudicial.  (P&A at 72.)  He argues that "even if *some* of the financial

17   evidence was admissible as circumstantial evidence of guilt, this did not justify counsel's failure

18   to object when the floodgates opened and a plethora of unduly prejudicial, irrelevant evidence

19   was admitted."  (Id. at 65.)  Although evidence of petitioner's credit rating and financial

20   problems five years prior to the crimes at issue was not relevant to the $2,000 deposit on the day

21   after the bank robbery, this court concludes that such evidence was not so prejudicial that

22   counsel's failure to object resulted in prejudice.

23   Petitioner also claims that, even if the evidence of petitioner's poverty was

24   properly admitted, the prosecutor's use of the evidence in his closing argument was prejudicial

25   misconduct to which his trial counsel should have objected.  In this vein, petitioner argues that

26   the prosecutor's argument was improper because evidence that petitioner did not have enough

1   money in the bank to cover his rent and truck payments did not "create the sort of desperate need

2   for money that might logically serve as a motive to commit robbery." (Id.) The state court

3   record reflects that the prosecutor's arguments were largely directed to refuting defense

4   testimony regarding the source of funds in petitioner's bank account, not to whether petitioner

5   had a motive to steal because he was poor. (See e.g., RT at 4103, 4112, 4117, 4123.) As such,

6   the prosecutor's arguments were not improper and petitioner's trial counsel was not ineffective in

7   failing to object thereto.

8              5.  Counsel's Failure to Impeach the Prosecutor's Photogrammetry Expert with

9   Prior Inconsistent Testimony

10             Petitioner's next claim is that his trial counsel rendered ineffective assistance

11   when he failed to impeach the prosecution's photogrammetry expert with his own prior

12   inconsistent testimony from petitioner's first trial. In this regard, petitioner argues that the

13   prosecution's expert was permitted to testify at petitioner's second trial that in the bank

14   surveillance videotape depicting Maples' accomplice, the distance from the floor to the top of the

15   accomplice's sweatshirt hood was 5' 5" plus or minus one quarter inch and that with all other

16   factors considered, the accomplice's height was between 5' 3" and 5' 7". (RT at 2329, 2301.)

17   Petitioner complains that his counsel failed to effectively challenge the expert's testimony that

18   his height estimate was conservative and that it would be a great error on his part if the

19   accomplice were 5' 8". Petitioner claims that this testimony was critical to the case since he is

20   5' 6" and David Hernandez, the actual accomplice under the defense theory of the case, was 5' 8".

21   Petitioner argues that had his counsel effectively cross-examined the prosecution expert he would

22   have made it clear to the jury that even under the prosecution expert's calculations Maples'

23   accomplice as pictured could have been as tall as David Hernandez. This argument was rejected

24   by the California Court of Appeal in a reasoned decision on petitioner's direct appeal. The

25   appellate court fairly described the factual background to this claim as follows:

26   /////

54

Richard Vorder Bruegge, an agent assigned to the special photographic unit of the FBI's criminal laboratory, testified in both of defendant's trials as an expert witness on behalf of the prosecution. He used a technique known as "reverse projection photogrammetry" to estimate the height of the person depicted in the bank's surveillance videos and described at trial as robber No. 2.

The process involves recreating the crime scene as captured on the surveillance tape, then transposing a measurement device to measure the distance between the floor and the top of the suspect's head. Vorder Bruegge selected a frame from the surveillance tape which depicted robber No. 2 in the best upright position recorded. He then went to the bank, determined the camera used to record that image had not been moved, placed a height chart exactly where the suspect stood, and filmed the scene with the chart. Using video technology, he then transposed and compared the suspect to the chart and measured the distance between the floor and the top of the suspect's head. Because robber No. 2 was wearing a hood, Vorder Bruegge measured the distance between the floor and the top of the suspect's hood.

In defendant's first trial, Vorder Bruegge testified the distance between the floor and the suspect's hood was approximately five feet five inches. When asked to describe sources of uncertainty underlying his estimate, Vorder Bruegge said there were a number. First, due to the limited resolution capabilities of video, he could never provide a more accurate estimate than plus or minus one-quarter-inch.

Second, there was uncertainty because he could not determine the space between the top of the suspect's head and the top of his hood. Third, he could not measure true height because he did not know the thickness of the soles of the suspect's shoes. A fourth uncertainty concerned the fact the suspect's knee in the picture was slightly bent. "Relating the true height of the individual to this distance, five feet, five inches to the top of the hood involves taking all those factors into consideration." However, during defendant's first trial, Vorder Bruegge did not provide a range of the suspect's true height accounting for these uncertainties while testifying under direct examination. He testified on direct only that the distance between the floor and the top of the suspect's hood was five feet five inches, plus or minus a quarter inch.

On cross-examination, defense counsel probed into these "uncertainties:"

"Q. So 'uncertainties' mean some sort of error when you're trying to put an estimate of value as to how tall that person might be; correct?

"A.  That's correct.

"Q.  Beyond a quarter of an inch, which you're testified to?

"A.  That's correct."

Defense counsel then began asking whether the camera's distance from the suspect, as well as its angle of view looking down upon the suspect, could distort the suspect's actual height.  Vorder Bruegge explained he could account and correct for this if he was able to locate the exact spot on the bank floor where the suspect stood and placed the height chart at that location.  He could move the chart to the left or right, relative to the camera, to align the chart with the top of the suspect's head where the suspect was leaning over or behind his feet, and in fact did so here.  Moving the chart to the left or right would not affect the measurement.  Vorder Bruegge acknowledged if the height chart was placed six inches behind where the suspect stood (relative to the camera), it would appear the distance from the floor to the top of the suspect's hood was five feet six inches; if he placed the chart six inches in front of where the suspect stood, it would appear the distance from floor to hood was five feet four inches.

"Q.  So that adds another inch to the quarter inch we're talking about?

"A.  That's right.

"Q.  Just based on the angle?

"A.  That's right.

"Q.  So, now, we're one and a quarter inch.  Rather than five-five, we're one and a quarter inch taller than five-five?

"A.  That is if you assume that is a – assume that the position I placed the height chart is six inches off from where the head is.  I believe the height chart is dead on right on top of the hood."

Accounting for the other uncertainties – the thickness of the shoe soles and the distance between the head and the hood, offset by the fact the suspect's knee was bent and he appeared to be leaning slightly, Vorder Bruegge concluded on cross the suspect's "true height," "includ[ing] this uncertainty of moving forward and backwards," was "somewhere between five feet three inches and five feet seven inches."  This estimate thus *included* the one-inch uncertainty caused by the angle of the camera view upon the location of the suspect's head.

On appeal, defendant claims his attorney in his second trial failed to bring out this one-inch uncertainty on cross-examination.  Had

1

2

3

> he done so, defendant asserts, it would have shown robber No. 2
> had a true height of somewhere between five feet four inches and
> five feet eight inches.  Robber No. 2 thus could have been as tall as
> David Hernandez, the person defendant theorized committed the
> crime.

4 (Opinion at 42-45.)[25]

5        The California Court of Appeal concluded that, contrary to petitioner's argument,

6 his trial counsel did address this possible one-inch height differential through his cross-

7 examination of the photogrammetry expert at the second trial.  The appellate court explained:

8

9

10

> Defendant misreads the record and misunderstands the expert's
> testimony.  As shown above, Vorder Bruegge included the one-
> inch uncertainty defendant targets in his estimated range of robber
> No. 2's true height.  Furthermore, defendant's trial counsel in fact
> raised the issue of the one-inch uncertainty caused by the angle of
> the camera looking down upon the suspect.

11

12

13

> At the second trial, Vorder Bruegge testified on direct the suspect's
> actual height was between five feet three inches and five feet seven
> inches tall.  On cross-examination, defendant's counsel raised the
> one-inch uncertainty as follows:

14

15

16

> "Q.  Now when you have given your estimate of uncertainty as
> being between 5-3 and 5-7, that's *without* taking into effect the
> angular problem you have due to the camera, correct?  You haven't
> factored that in yet?

17 > "A.  No.  I *have* factored it in.

18 > "Q.  You have, but you haven't talked about it yet?

19 > "A.  That's correct.

20 > "Q.  You factored it in without being asked for it, right?

21

22

> "A.  I factor that into my determination based on my experience in
> conducting these cases, and I do that before I even come to court."
> (Italics added.)

23

24

> Under defense counsel's questioning, Vorder Bruegge then
> explained how the angle of the camera could introduce uncertainty
> into the measurement of height depending upon the accuracy of
> locating where the suspect had stood during his crime and of

25

26

---

[25]  The DMV record of David Hernandez listed his height as 5' 8".  (RT at 3204, 3308.)
Petitioner is 5' 6".  (Id. at 2304.)

placing the height chart there, similar to his explanation of the issue in the first trial.  After cross examining Vorder Bruegge extensively on the manner in which he dealt with this issue, defendant's counsel than summarized the expert's position:

"Q.  Well what seems simple to you I am not sure seems simple to me.  So I guess what you are saying is when you came up with your calculations of shoes, stooping, foot movement, hood, all of those things, you actually – your technological error because of the video distortion, the *angular offset of the camera, you basically factored all that in* before you gave the opinion on direct that he was between 5-3 and 5-7; is that what you are saying?

"A.  Yes."  (Italics added.)

Thus, contrary to defendant's position before us, defendant's trial counsel did not fail to raise the one-inch uncertainty caused by the angle of the camera in relation to the location of the height chart.  The issue was raised in both trials, and in both trials, it was included in the expert's opinion of the suspect's height.  It did not, as defendant asserts here, add an additional inch to the expert's estimate of the suspect's true height.  Defendant did not suffer ineffective assistance of counsel on this matter.

(Id. at 45-47.)

Petitioner summarizes his claim before this court as follows:

[Petitioner's contention is] *not* that counsel had failed to raise the issue, nor was it that the expert did not *claim* to have included all the uncertainties in his height estimate.  The issue, rather, is that counsel *incompetently* raised the issue by not demonstrating to the jury that the expert, despite his claim to the contrary, had *not* accounted for all the uncertainty factors in his estimate because simple arithmetic proved otherwise.

(P&A at 82.) (emphasis in original.)  In support of this claim, petitioner has constructed a chart describing all of the possible error factors inherent in the photogrammetry expert's height analysis, derived from petitioner's interpretation of the expert's testimony at both trials.  (Id. at 77.)  Petitioner asserts that those errors could have added as much as three and one-quarter inches to the expert's original 5' 5" height estimate.  (Id. at 77-78.)  Petitioner notes that the photogrammetry expert testified that "he was being conservative in providing his estimate range and that it would have to be a very great error if the accomplice were 5' 8".  (Pet. at 16; RT at 2352.)  Petitioner argues that had his trial counsel brought out all of the possible error factors in

58

1   the prosecution expert's own analysis as listed on petitioner's chart, the jury would have

2   understood that the accomplice's height could have been the same as Hernandez's height in

3   keeping with the prosecution expert's analysis and without a "very great error" in the expert's

4   estimate. (Pet. at 16-17.)

5          In order to prevail on this claim, petitioner must demonstrate both that his

6   counsel's cross-examination of Dr. Vorder Bruegge was outside the wide range of professionally

7   competent assistance and a reasonable probability that, but for counsel's deficient performance,

8   the result of the proceedings would have been different.  Petitioner has failed to make either

9   required showing.  As described by the state appellate court, trial counsel's vigorous cross-

10  examination of Dr. Vorder Bruegge disclosed numerous error factors that could have impacted

11  his estimate of the accomplice's height and created doubt about the validity of his conclusions.

12  Further, the record does not support petitioner's confident assurance that all of the possible error

13  factors listed in his chart could legitimately be added to the expert's height estimate of 5' 7".  For

14  instance, petitioner attributes an error factor of one-inch to the possibility that the expert

15  misplaced the height chart.  (P&A at 77.)  However, the expert testified at petitioner's first trial

16  that he believed he had placed the height chart "dead on right on top of the hood."  (RT at 240.)

17  In light of this testimony, the validity of this error factor is speculative at best.

18          Petitioner has also failed to demonstrate prejudice.  As noted by the state appellate

19  court, the expert testified that he had included all legitimate factors into his final height analysis.

20  (See, e.g., id. at 2302.)  There is no indication that further questioning would have resulted in a

21  change in this testimony.  Indeed, contrary to petitioner's claim, his counsel at the second trial

22  cross-examined Vorder Bruegge in some detail regarding his locating of the accomplice at an

23  exact spot in making his height calculation. (RT 2296-97, 2333-34.)  The prosecution's expert

24  was unwavering in his testimony that he was convinced that he had placed the height chart at the

25  exact spot where the accomplice was pictured standing in reaching his conclusions.  In addition,

26  petitioner's jurors were advised of numerous factors that could have affected the expert's

1   analysis and they knew that some of these factors (i.e., the height of the suspect's shoe sole, the

2   extent to which the suspect was stooping, and the extent to which the suspect was standing at a

3   relaxed position) could have added additional height to the photogrammetry expert's estimate.

4   The undersigned also notes that the possible height range proffered by the expert covered a span

5   of four inches.  This significant height span would appear to lessen the reliability of his

6   conclusion as to the possible height of Maples' accomplice.  Further, some eyewitnesses to the

7   bank robbery estimated the accomplice's height at significantly more than Vorder Bruegge's

8   tallest estimate of 5' 7".  This evidence cast further doubt on Vorder Bruegge's testimony.

9   Petitioner has simply failed to establish prejudice with respect to this claim.

10          For all of these reasons, petitioner is not entitled to relief on his claim that his trial

11   counsel's failure to conduct an adequate cross-examination of the photogrammetry expert

12   constituted ineffective assistance.

13                  6.  Counsel's Failure to Call a Photogrammetry Expert

14          Petitioner's next claim is that his trial counsel rendered ineffective assistance by

15   failing to consult with and call his own photogrammetry expert.  He argues that his defense that

16   Hernandez was Maples' accomplice was substantially undermined by the testimony of Dr.

17   Vorder Brugge and that defense counsel was ineffective in failing to counter this evidence with

18   his own expert witness.  Petitioner also argues that by failing to consult with his own

19   photogrammetry expert, trial counsel was not able to effectively cross-examine Dr. Vorder

20   Brugge.  In support of this claim, petitioner has filed the declaration of Paul Kayfetz, a previously

21   qualified expert in "engineering photography."  (Pet., Ex. 8 at ¶ 2.)  Mr. Kayfetz declares that:

22   /////

23   /////

24   /////

25   /////

26   /////

> by adding together all of the error factors variously quantified in
> Dr. Vorder Bruegge's testimony, by considering those which he
> understated and those which he omitted, and by my own estimates
> of the camera angle, that the possible upper end of the uncertainty
> range for the height of the subject is 5'-10".

(Id. at ¶ 13.)[26]

This claim was raised for the first time in petitioner's application for a writ of

habeas corpus filed in the Placer County Superior Court.  The Superior Court denied the claim in

a reasoned opinion which provides the basis for the state court's decision.  Nunnemaker, 501

U.S. at 803-04; Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  The Superior Court

explained its reasoning as follows:

> The Petitioner presents the declaration [sic] Paul Kayfety to
> support the argument that trial counsel should have consulted with
> and called an expert to counter the testimony of Dr. Vorder
> Brugge.  Mr. Kayfety states that he is president of Paul Kayfety, is
> a member of American Academy of Forensic Scientists, and has
> qualified over 400 times to testify as an expert witness in "areas of
> engineering photography".  He fails to state his academic
> background.  Paul Kayfety's declaration largely covers the same
> area as trial counsel's cross-examination of Dr. Vorder Brugge.
> One must recognize that this was the second encounter between
> trial counsel and Vorder Brugge.  Counsel was well aware what the
> testimony would be and, based on the results from the first trial,
> how to best counter the agent's testimony.  The decision not to call
> his own expert is within counsel's proper exercise of trial strategy.
>
> There exists a "strong presumption that counsel's conduct falls
> within the wide range of reasonable professional assistance,"
> Strickland v. Washington (1984) 466 U.S. 668, 689.  If it can be
> said trial counsel failed to meet this standard the Petitioner has
> failed to establish that there was a reasonable probability the result
> of the trial would have been different.

(Pet., Ex. 3 at III-IV.)

The Superior Court opined that trial counsel's decision not to consult his own

photogrammetry expert was a reasonable tactical decision based on his view of how best to

---

[26]  Petitioner's trial counsel told an associate at the firm of petitioner's current counsel
"that during his preparation for trial, he never consulted with a photogrammetry expert."  (Pet.,
Ex. 7 at ¶ 3.)

challenge at petitioner's second trial the testimony of Dr. Vorder Brugge, who had already testified at petitioner's first trial.[27]   Counsel's apparent strategy with respect to this witness was to impeach him with the information developed through his cross-examination at the first trial. This was a reasonable strategy under the circumstances of this case.  See Furman v. Wood, 190 F.3d 1002, 1006 (9th Cir. 1999) (citing Strickland, 466 U.S. at 687) ("[c]ounsel's tactical decisions are 'virtually unchallengeable'").  While other counsel may have chosen to consult their own photogrammetry expert, the decision of the state courts that it was not ineffective for petitioner's trial counsel to choose a different tactic is not an unreasonable application of Strickland.  Accordingly, petitioner is not entitled to relief on this claim.

### 7.  Counsel's Failure to Introduce Fingerprint Evidence

Petitioner's next claim is that his trial counsel rendered ineffective assistance when he failed to introduce fingerprint evidence that would have tended to eliminate petitioner as one of the perpetrators.  The background to this claim is as follows.  Ms. Scanlon testified that while she was in the trunk of her car, but before the bank robbery, the car stopped and Ms. Scanlon heard what appeared to be someone leaving the car and then re-entering the car.  (RT at 1756, 1840-43.)  Ms. Scanlon then heard the "rustling of bags" and "the pop top of a can."  (Id. at 1756, 1842.)  At trial, Sacramento County Deputy Sheriff Michael Butler testified that a soda can was found in Ms. Scanlon's car and that Ms. Scanlon told him the can was not in the car before she was kidnapped.  (Id. at 2698.)  Fingerprints were taken from the side of the can and compared to fingerprint exemplars from Maples, petitioner and Ms. Scanlon.  (Pet., Exs. 9, 10, 11.)  The fingerprints were also compared to a fingerprint exemplar of David Hernandez, who under the defense theory of the case was Maples' actual accomplice.  (Pet., Ex. 11.)  The test results for all of these persons were negative.  (Id.)

---

[27]  Again, the jury at petitioner's first trial was unable to reach a verdict and a mistrial was declared.  Trial counsel may well have concluded that there was no reason to change strategies at the retrial with respect to his handling of this witness.

1    Petitioner contends that these fingerprint test results constituted "exculpatory

2    evidence" and that his trial counsel was ineffective in failing to introduce them into evidence.  He

3    notes that because the evidence at trial demonstrated that Maples was wearing gloves and his

4    accomplice was not, it is reasonable to conclude that the fingerprints on the soda can belonged to

5    Maples' accomplice.  Petitioner argues that the fact neither his fingerprints nor those of Maples

6    were on the can suggest that another person, and not petitioner, was Maples' accomplice.

7    Petitioner's current counsel has submitted a declaration in which he states that when he asked

8    petitioner's trial counsel why he did not introduce evidence that petitioner's fingerprints were not

9    found on the soda can that the police retrieved from Ms. Scanlon's car, trial counsel responded

10   that because the can did not show David Hernandez's prints and Detective Bertoni testified at the

11   first trial that the prints were not good enough to make any identification, the testimony would

12   not have helped petitioner.  (Pet., Ex. 7, ¶ 4.)

13   Petitioner's claim in this regard was raised for the first time in a petition for a writ

14   of habeas corpus filed in the Placer County Superior Court.  (Answer, Ex. G.)  The Superior

15   Court rejected petitioner's claim, reasoning as follows:

16   Item #3 instance of ineffective assistance of counsel is trial
     counsel's failure to introduce evidence that fingerprints found on a
17   soft drink can located in Tamara Scanlon's vehicle did not match
     either David Maples or Alan Chappel.
18
     It was obvious from the trial that the defense in this case was not
19   that somebody else was Maples' accomplice but that David
     Hernandez was his accomplice.  All evidence presented by either
20   the prosecution or defense pointed to either the Petitioner or Mr.
     Hernandez as Maples accomplice.  It is quite reasonable to
21   conclude that competent trial counsel would not wish to confuse
     the jury and undermine his defense theory by introducing a
22   fingerprint he cannot associate to Hernandez.

23   (Answer, Ex. I at IV-V.)

24   Petitioner argues that any rational juror would have understood that the absence of

25   a link between the fingerprint on the soda can and either petitioner or Hernandez tended to

26   exculpate petitioner, even if it also tended to exculpate Hernandez.  He argues that because the

evidence had a tendency to support petitioner's defense and might have created a reasonable doubt as to petitioner's guilt, it should have been presented and counsel's failure to do so "fell below an objective standard of reasonableness." (P&A at 94.)

This court disagrees. Petitioner's trial counsel made a tactical decision not to introduce the fingerprint evidence because he thought the evidence might tend to undercut his defense that David Hernandez was Maples' accomplice. Although petitioner disagrees with counsel's decision in this regard, that is not the test. Where it is possible that the failure to present evidence was a "difficult but thoughtful tactical decision," a reviewing court must presume that counsel's conduct was "within the range of competency." Harris v. Pulley, 885 F.2d 1354, 1368 (9th Cir. 1988). Accordingly, petitioner is not entitled to habeas relief on his claim that his trial counsel was ineffective in failing to present the fingerprint evidence.

8. Counsel's Failure to Object to the Trial Court's Erroneous Denial of the Prosecutor's Motion to Compel Maples to Testify

Petitioner's next claim is that his trial counsel rendered ineffective assistance when he failed to "voice a contemporaneous objection" to the trial court's denial of the prosecution motion to compel Maples to testify in exchange for a grant of immunity. Petitioner argues that if his trial counsel had objected to the court's ruling on constitutional grounds, "the majority would have had to address the issue on its merits." (Pet. at 27.) In his traverse, petitioner explains that this claim "is his alternative means for rectifying the error of the trial court's exclusion of the Maples' testimony." (Traverse at 36.) As discussed above, the trial court's ruling denying the prosecutor's motion to compel Maples' testimony was not erroneous. Accordingly, there is no reasonably probability that, but for trial counsel's failure to object, the result on appeal would have been more favorable to petitioner. Petitioner is not entitled to relief on this claim.

/////

/////

C. <u>Cumulative Error</u>

Petitioner's final claim is that he is entitled to habeas relief as a result of the cumulative effect of errors at his trial.  In light of this court's recommendation that habeas relief be granted as to petitioner's claims that his trial counsel rendered ineffective assistance when he failed to object to the admission of testimony reflecting the pretrial identification of petitioner, the court need not reach petitioner's claim of cumulative error.

CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be granted on petitioner's claims that his trial counsel rendered ineffective assistance by failing to challenge the victim's identification of petitioner at his preliminary hearing as unduly suggestive and unreliable and on the basis that it occurred outside the presence of petitioner's attorney, and denied in all other respects.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: June 26, 2006.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:8:chappel132.hc